**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 11-3419
———

JAMIE LICHTENSTEIN,
Appellant

v.

UNIVERSITY OF PITTSBURGH MEDICAL CENTER,
trading and doing business as UPMC; DEBORAH LIDEY;
UPMC PRESBYTERIAN SHADYSIDE, doing business as
Western Psychiatric Institute and Clinic; UPMC
BRADDOCK
———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 09-cv-1350)
District Judge: Honorable William L. Standish
———

Argued on June 19, 2012

Before: AMBRO, VANASKIE and VAN ANTWERPEN,
Circuit Judges

(Filed: August 3, 2012  )

Charles H. Saul, Esq. **[ARGUED]**
Kyle T. McGee, Esq.
Margolis Edelstein
525 William Penn Place, Suite 3300
Pittsburgh, PA 15219
      *Counsel for Appellant*

John J. Myers, Esq. **[ARGUED]**
Andrew T. Quesnelle, Esq.
Eckert, Seamans, Cherin & Mellott LLC
44th Floor, U.S. Steel Tower
600 Grant Street
Pittsburgh, PA 15219
      *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, Circuit Judge.

I.

Appellant Jamie Lichtenstein alleges that her employer, University of Pittsburgh Medical Center (UPMC),[1] terminated her employment in violation of the Family

_____

[1] Our reference to UPMC throughout this opinion, unless otherwise indicated, is a collective reference to all four defendants in this case, including UPMC Presbyterian Shadyside, UPMC Braddock, and Deborah Lidey.

Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.* The District Court granted summary judgment to UPMC on Lichtenstein's retaliation and interference claims. Lichtenstein's challenge to the District Court's decision requires us to consider (a) the specificity of information employees must provide to adequately notify employers of unforeseeable FMLA leave, and (b) the nature of a pretext analysis when a legitimate justification for terminating an employee pre-existed that employee's exercise of FMLA rights. Based on the evidence in this case, genuine factual disputes exist about whether Lichtenstein's notice was adequate, whether her invocation of FMLA rights was a negative factor precipitating her termination, and whether UPMC's proffered justification for its action was mere pretext for retaliation. Accordingly, we will vacate the District Court's grant of summary judgment on both claims and remand for further proceedings.

## II. FACTS & PROCEDURAL HISTORY

Jamie Lichtenstein began working with UPMC in October 2005 as a research associate at UPMC's Western Psychiatric Institute and Clinic. In September 2007, Lichtenstein transferred to UPMC's hospital in Braddock, Pennsylvania ("Braddock") where, less than four months later, she was discharged. During her short tenure at Braddock, Lichtenstein worked as a psychiatric technician under the supervision of Deborah Lidey. Because this was a new position for her, Lichtenstein was subject to a six-month probationary period in which UPMC's progressive discipline policy did not apply.

3

Although Lichtenstein received a merit-based raise to her salary in October 2007, her time at Braddock was tarnished by attendance problems and scheduling difficulties. From October through the end of December, Lichtenstein was tardy six times, absent twice, and requested changes to her schedule on multiple occasions after the deadline for requesting such changes had passed. The most egregious incident during this time occurred on December 1st, a day which Lichtenstein was scheduled to work a sixteen-hour shift. In the days preceding December 1st, two co-workers complained that Lichtenstein was planning to call-off if she could not find a replacement. One of these co-workers told Lidey that Lichtenstein claimed she needed the day off to do school work[2] and/or attend a concert. Lichtenstein's co-workers were upset because UPMC policy prohibited premeditated call-offs, and one of them might have to fill in for her if she did not show up. In response to these complaints, Lidey emailed Lichtenstein for an explanation. Lichtenstein told Lidey she was hoping to take December 1st off because it was the only day she could work on a group project for school. Although Lidey denied this request, Lichtenstein (alleging she was sick) called off.

In her deposition, Lidey indicated that Lichtenstein's December 1st call-off was the moment when she first considered firing her. According to Lidey, "I had already made many accommodations in her schedule, and I had in my mind, if she calls off, then we can't further this." App. at

---

[2] In addition to her full-time position at Braddock, Lichtenstein was also a part-time student. During her job interview, Lidey told Lichtenstein that UPMC would attempt to accommodate her school schedule.

331. Lidey did not, however, terminate Lichtenstein for the incident, nor did she issue a written warning. Lichtenstein's employment thus continued and arguably had a bright spot in the days before Christmas when Lidey sent an email thanking her for volunteering to fill people's shifts on both Christmas Eve and Christmas Day. Less than three weeks later, on January 10, 2008, Lidey informed Lichtenstein that her employment was terminated.

While it is undisputed that UPMC terminated Lichtenstein for attendance problems and scheduling difficulties, the parties vigorously dispute the event, or "final straw," that triggered the termination. According to UPMC, the final straw occurred on December 30th, when—according to UPMC's time logs—Lichtenstein arrived at work several hours late and departed several hours early. Although this incident was not recorded on Lichtenstein's staff log,[3] and although Lidey was unable to recall when she first learned about it,[4] UPMC insists this incident was the trigger for Lichtenstein's termination. UPMC further asserts that the 11-day delay between this December 30th incident and Lichtenstein's termination can be explained by the following

---

[3] The staff log was maintained by Amy Harris, UPMC's administrative assistant for scheduling. The "time log," on the other hand, was maintained through UPMC's computerized system. As discussed below, the staff log is the document Lidey reviewed prior to terminating Lichtenstein, and is the document UPMC submitted to the EEOC as "Exhibit M" to document Lichtenstein's attendance problems.

[4] When asked when she first learned of the December 30th incident, Lidey stated "I can't remember that." App. at 344.

two facts: (1) Lidey went on vacation on December 31st and did not return until January 7th, and (2) Lidey's plan to fire Lichtenstein on January 8th was thwarted by Lichtenstein's request for leave that morning.

To support its assertion that Lidey made the termination decision prior to leaving for vacation on December 31, UPMC relies entirely on Lidey's own testimony. In her deposition, Lidey stated that she made the decision to terminate Lichtenstein before January 3rd. *Id.* at 344. Lidey also testified that prior to terminating employees she always consults with Helene Brown, the head of Human Resources. When asked when she first spoke with Brown about terminating Lichtenstein, Lidey stated that it was "before the New Year's." *Id.* at 345. Elsewhere, however, Lidey contradicted herself on both of these points. The following are other answers Lidey gave when asked about the date she decided to fire Lichtenstein:

> Q. "Had you made the decision to terminate [Lichtenstein] before you went on leave?"
> A. "I would have to go back and look at dates." *Id.* at 331.
>
> Q: "Was [the termination decision made] before you went on leave?"
> A: "I can't remember dates." *Id.* at 345.

Similarly, when asked to clarify when she first spoke with Helene Brown, Lidey provided the following responses:

> Q: "Did you start your discussions with [Human Resources] after you came back

6

> from leave or before you went on leave?"
> A: "I don't remember that." *Id.* at 328.
>
> Q: "Was there a discussion with Human Resources in December of 2007 before you went on leave to terminate Jamie Lichtenstein?"
> A: "I cannot remember the exact date." *Id.* at 332.
>
> Q: "Did you talk to HR before . . . January 7, 2008?"
> A: "I don't remember that." *Id.* at 331.

Helene Brown was also unable to recall when she and Lidey first discussed Lichtenstein's termination. *Id.* at 423. Brown could only recall that it was before January 8th and could not remember whether it was before, or after, Lidey went on leave. *Id.*

Lichtenstein's first scheduled shift after Lidey went on leave was January 3, 2008 at 3:00 p.m. Lichtenstein did not make her shift that day, however, because early that morning her mother was rushed to the hospital in an ambulance after collapsing from a sudden excruciating pain in her leg. When Lichtenstein arrived at the emergency room she saw her mother crying from the pain. She had never seen her mother crying as she was that morning and Lichtenstein tried her best to comfort her. Although unnerved, Lichtenstein called UPMC's nursing supervisor prior to noon to say she couldn't make her shift.[5] During the phone call, Lichtenstein told the

---

[5] It is undisputed that by calling the nursing supervisor when she did on January 3rd, Lichtenstein followed UPMC's proper procedure for calling off sick. *See* App. at 308, 395–

supervisor she "was currently in the emergency room, that my mother had been brought into the hospital via ambulance, and I would be unable to work that day." *Id.* at 211. UPMC was able to find someone to take Lichtenstein's shift and Cynthia Krautz (Lidey's replacement while she was away) emailed Lidey to inform her that Lichtenstein had called off. Although Krautz's email did not indicate a reason for Lichtenstein's call-off, Amy Harris (UPMC's employee in charge of staff scheduling) marked the absence in Lichtenstein's staff log as "sick mom." *Id.* at 585.

Lichtenstein's mother's condition was serious. Doctors diagnosed her as suffering from disc hernia, myopathy, and nerve impingement, and she remained hospitalized until January 8th. During this hospital stay, Lichtenstein and her brother, Michael, spent a considerable amount of time with their mother and ran various errands, including taking care of her dogs. Lichtenstein's mother, whose recollection of her time at the hospital was "a little foggy," *id.* at 493, testified that "Jamie was really the 24/7 person that would be there, and Michael would come and relieve her occasionally so she could run to the store and pick up things or stuff like that or try to make me eat something," *id.* at 494. Lichtenstein, however, did find time to work her shifts at UPMC on both January 4th and 5th. During these shifts, Lichtenstein made no further mention of her mother's condition.

On January 7th, Lidey returned from vacation. On her first morning back, Lidey forwarded Harris a copy of

96, 451–52. Nevertheless, the adequacy of the notice she gave is an issue in this case.

8

Krautz's email from January 3rd in which Krautz apprised Lidey that Lichtenstein had called-off. Above this forwarded message from Krautz, Lidey wrote: "Please pull up Jamie's call offs for me." *Id.* at 584. In response, Harris gave Lidey a copy of the staff log, which included Harris's "sick mom" notation in the entry for Lichtenstein's January 3rd absence.[6] Lidey claims she did not see this particular notation when she reviewed the log.

In their depositions, Brown and Lidey testified that Lidey planned to terminate Lichtenstein on January 8th, the day after Lidey returned from vacation. This plan was foiled, however, when Lichtenstein contacted UPMC early that morning to request leave to care for her mother. At 12:18 pm, Lichtenstein sent Lidey the following email:

> I am not sure if you are aware, but my mother has been in the hospital since Thursday [January 3rd]. I am not sure how much longer they will keep her hospitalized. And once she is released, she might require some assistance. Under these circumstances and at this point in time, I would like to, as well as need to, take a leave of absence. Who do I speak with to aid me in this process?

*Id.* at 586.

Lidey, who receives hundreds of emails a day, claims she did not read this particular email. In fact, Lidey insists

---

[6] Lidey also requested and received from Harris a copy of Lichtenstein's staff log on January 9th as well.

that she terminated Lichtenstein "before I knew anything about her mom being ill or needing to ask for leave." *Id.* at 335. This claim, however, is at odds with other evidence in the record, including the fact that Lidey responded to Lichtenstein's email.[7] Although Lidey claims she did not read Lichtenstein's email prior to replying to it, Brown testified that Lidey told her Lichtenstein's mother was sick. *Id.* at 424. According to Brown, "What I recall her saying was that Jamie was stating that she needed to be off to care for her mother." *Id.* Brown testified that Lidey conveyed this information *prior* to Lichtenstein's termination.

After her termination, Lichtenstein filed a complaint with the EEOC alleging religious discrimination. In response, UPMC sent a position statement to the EEOC in which it described its reasons for firing Lichtenstein. According to this position statement:

> Once Ms. Lichtenstein began working at UPMC Braddock, she had numerous incidents of tardiness and absenteeism. She was also a 'nightmare' to schedule according to Amy Harris, the Administrative Assistant in charge of scheduling. Although the hospital was willing to accommodate her school schedule, Ms. Lichtenstein was also constantly requesting days off to study or complete schoolwork. By January 4, 2008, Ms. Lichtenstein had been absent three times

---

[7] Lidey's reply email was not simply an automated out-of-office reply. In the email, Lidey stated: "I am out of the office today, please call Amy to schedule a time that you can come in and meet with me tomorrow [January 10th]." *Id.* at 602.

10

(including once for a sixteen hour shift) and tardy six times. . . . Documentation regarding Ms. Lichtenstein's lateness, absences and scheduling issues is enclosed as Exhibit M.

*Id.* at 592. As documented in Exhibit M, one of the "three absences" referenced in the position statement was Lichtenstein's absence on January 3rd. Lidey's late appearance and early departure on December 30th was not mentioned, either in Exhibit M or the position statement.

In addition to filing a claim for religious discrimination, Lichtenstein filed a complaint under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*. Lichtenstein argued that her absence on January 3rd qualified for leave under the FMLA, and that UPMC had impermissibly considered this absence in terminating her employment. The District Court granted UPMC's motion for summary judgment and Lichtenstein filed this timely appeal.

## III. LEGAL BACKGROUND[8]

### A.    STANDARD OF REVIEW

We review the District Court's grant of summary judgment *de novo*. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995). Summary judgment should only be granted if "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant.

---

[8] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986). A dispute is material if it could affect the outcome of the case. *Id.* In considering the record, we must draw all reasonable inferences in favor of the non-moving party, which in this case, is Lichtenstein. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.   FAMILY MEDICAL LEAVE ACT (FMLA)

Congress passed the FMLA in 1993 in an attempt "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). Accordingly, the FMLA "entitle[s] employees to take reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), but employees must do so "in a manner that accommodates the legitimate interests of employers," 29 U.S.C. § 2601(b)(3). Eligible employees are entitled to "12 workweeks of leave during any twelve-month period . . . [i]n order to care for the . . . parent of the employee, if such . . . parent has a serious health condition." 29 U.S.C. § 2612(a)(1); *see also* 29 C.F.R. § 825.101(b) ("When a family emergency arises, . . . workers need reassurance that they will not be asked to choose between continuing their employment, and meeting their . . . family obligations.").

As indicated, eligible employees are entitled to take FMLA if they "care for" a family member with a "serious health condition." A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. § 825.114 (defining inpatient care as "an overnight stay in a hospital"). To "care

12

for" a family member, the employee must provide either physical or "psychological care," including "psychological comfort and reassurance which would be beneficial to a . . . parent with a serious health condition who is receiving inpatient or home care."  29 C.F.R. § 825.124(a).

Even when these qualifying circumstances exist, employees cannot invoke rights under the FMLA if they fail to provide adequate notice of their need for leave.  29 U.S.C. § 2612(e).  When the need for leave is unforeseeable,[9] employees are obligated to notify their employer "as soon as practicable," 29 C.F.R. § 825.303(a), and "provide sufficient information for an employer to reasonably determine whether the FMLA may apply," 29 C.F.R. § 825.303(b).

When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights.  29 U.S.C. § 2615(a)(1).  Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful."  29 U.S.C. § 2615(a)(2).  The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."  *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  Although neither provision expressly forbids employers from terminating employees "for having

---

[9] *See generally Cavin v. Honda of America Mfg., Inc.* , 346 F.3d 713, 722 (6th Cir. 2003) ("The regulations suggest that notice requirements for unforeseeable leave are more relaxed than the requirements for foreseeable leave, in keeping with the idea that an unforeseeable need for leave will often arise in the context of a medical emergency.").

13

exercised or attempted to exercise FMLA rights," a Department of Labor regulation has interpreted the sum of the two provisions as mandating this result. *See* 29 CFR § 825.220(c). Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions or disciplinary actions."[10] *Id.* Accordingly, an employee does not need to prove that invoking FMLA rights

---

[10] The regulation does not specify which of the two statutory provisions is the specific source of this prohibition. *See* 29 CFR § 825.220(c). Perhaps not surprisingly, therefore, courts interpreting the regulation have reached different conclusions on this question. *See Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 n.9 (3d Cir. 2004) (citing cases). As with the Ninth Circuit, we have predicated liability for retaliation based on an employee's exercise of FMLA rights on the regulation itself. *Id.* Our discussion on this point, however, has spurred its own share of confusion, with some courts citing *Conoshenti* as specifically locating these claims in 29 U.S.C. § 2615(a)(1). *See, e.g.*, *Phillips v. Mathews*, 547 F.3d 905, 914 (8th Cir. 2008) (Colloton, J., concurring). Adding a further wrinkle, the Department of Labor has subsequently amended the first sentence of 29 CFR § 825.220(c) to include, *inter alia*, the words "interference" and "retaliating." *See* 73 Fed. Reg. 67934, 68055 (Nov. 17, 2008); *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012). Since the parties have not briefed this matter, and because it does not affect the resolution of this appeal, we do not resolve here whether the regulation's amended language has any material impact on our reasoning in *Conoshenti*.

was the sole or most important factor upon which the employer acted.

## IV. ANALYSIS

Although the gravamen of Lichtenstein's claim sounds in retaliation, she alleges both retaliation and interference claims. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). As will be seen, both claims are closely intertwined.

### A. RETALIATION

To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *See Erdman*, 582 F.3d at 508–09 (modifying *Conoshenti*, 364 F.3d at 146). Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490

U.S. 228, 276–77 (1989) (O'Connor, J., concurring). *See Conoshenti*, 364 F.3d at 147.[11]

Although some courts have recently questioned the viability of mixed-motive claims under the FMLA in the wake of *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2349 (2009),[12] the only federal court of appeals to rule on the issue has held that *Gross* does not preclude FMLA mixed-motive claims. *See Hunter v. Valley View Local Sch.*, 579 F.3d 688, 692 (6th Cir. 2009). The Department of Labor has taken a similar position, stating its view in an amicus brief that the FMLA continues to allow mixed-motive claims. *See* Brief for the Sec'y of Labor as Amicus Curiae in Support of Plaintiff-Appellant, Breeden v. Novartis Pharm. Corp., 646 F.3d 43 (D.C. Cir. 2011) (Nos. 10-7073; 10-7078). Although Lichtenstein calls on us to apply the mixed-motive framework

---

[11] Although this Court has not specifically ruled that *McDonnell Douglas* applies to FMLA-retaliation claims based on circumstantial evidence, this is implied by our application of *Price Waterhouse* to claims based on direct evidence, *Conoshenti*, 364 F.3d at 147, and is the prevailing rule of the federal courts, *see, e.g.*, *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331–32 (1st Cir. 2005); *Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004); *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999).

[12] *See, e.g.*, *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir. 2011) ("In light of the recent decision of the United States Supreme Court in *Gross* . . . there is a substantial question whether a mixed motive analysis would apply in a retaliation claim under the FMLA.").

to her retaliation claim, she readily survives summary judgment under the more taxing *McDonnell Douglass* standard. Accordingly, we proceed under *McDonnell Douglass* and leave for another day our resolution of whether the FMLA continues to allow mixed-motive claims in the wake of *Gross*.

Under the *McDonnell Douglass* framework, Lichtenstein has the initial burden of establishing a prima facie case. To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim: (a) invocation of an FMLA right, (b) termination, and (c) causation. *See Erdman*, 582 F.3d at 508–09; *Conoshenti*, 364 F.3d at 146. If Lichtenstein can do so, the burden of production shifts to UPMC to "articulate some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglass*, 411 U.S. at 802. If UPMC meets this minimal burden, Lichtenstein "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [UPMC's] articulated legitimate reasons." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

In its ruling below, the District Court granted summary judgment to UPMC based on its conclusions that Lichtenstein (1) failed to establish the invocation (i.e., notice) and causation prongs of the prima facie case, and (2) failed to identify evidence casting reasonable doubt on UPMC's proffered justification for her termination. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 805 F. Supp. 2d 190, 205–11 (W.D. Pa. 2011). We will address each of these issues in turn, beginning with notice.

17

### 1. Notice[13]

To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave. 29 U.S.C. § 2612(e)(2). In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA *may* apply to the leave request." *Id.* (emphasis added). As we have previously noted, this is not a formalistic or stringent standard. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (stating that the statutory and regulatory text suggests a "liberal construction" be given to FMLA's notice requirement); *see also Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 477 (8th Cir. 2007) ("The regulations already make it very easy for [an employee] to give notice of her intent to take leave."); *Burnett v. LFW Inc.*, 472 F.3d 471, 478

---

[13] Our reference to UPMC in this section is limited to the three corporate defendants, as Lidey was not a party to Lichtenstein's phone conversation with the nursing supervisor on January 3rd and there is no evidence that she was aware of the exact information Lichtenstein conveyed. She later learned, however, from both the staff log and Lichtenstein's email to her, that Lichtenstein's mother had been hospitalized on January 3rd and that Lichtenstein had called off on the same day to be with her "sick mom." As set forth in our discussion of causation below, there is a genuine factual dispute as to whether Lidey had sufficient notice of Lichtenstein's FMLA leave prior to the time of the termination.

(7th Cir. 2006) ("The notice requirements of the FMLA are not onerous.").

While the FMLA "does not require an employer to be clairvoyant," *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 428 (6th Cir. 2004), this does not mean that employees need to provide every detail necessary for the employer to verify if the FMLA applies. *See, e.g.*, *Ruble v. Am. River Transp.*, 799 F. Supp. 2d 1017, 1025 (E.D. Mo. 2011) ("Plaintiff was not required to provide all the details necessary to show he was entitled to FMLA leave."). This conclusion is dictated by the language of 29 C.F.R. § 825.303(a), which provides that "where the employer does not have sufficient information about the reason for an employee's use of leave, *the employer* should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying" (emphasis added). The regulations thus clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies. Accordingly, the "critical test" is not whether the employee gave every necessary detail to determine if the FMLA applies, but "how the information conveyed to the employer is reasonably interpreted." *Sarnowski*, 510 F.3d at 402. How the employee's notice is reasonably interpreted is generally a question of fact, not law.[14] *Murphy v. FedEx*

---

[14] There are cases, of course, where the undisputed facts are such that "no rational trier of fact could conclude" that the employee's notice was adequate. *See, e.g.*, *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980–81 (5th Cir. 1998). In such cases, the adequacy of notice can be determined as a matter of law.

*Nat'l. LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010); *Burnett*, 472 F.3d at 479; *Hopson v. Quitman Cnty. Hosp. & Nursing Home, Inc.*, 126 F.3d 635, 640 (5th Cir. 1997); *Cavaliere v. Advertising Specialty Institute Inc.*, --- F.Supp.2d ---, 2012 WL 525891, at *12 (E.D. Pa. Feb. 16, 2012); *Zawadowicz v. CVS. Corp.*, 99 F. Supp. 2d 518, 529 (D.N.J. 2000); THIRD CIRCUIT MODEL JURY INSTRUCTIONS–CIVIL § 10.1.1 (2011). *But see Cavin*, 346 F.3d at 723 (stating Sixth Circuit's view that adequacy of notice is a question of law). Under the circumstances of this case, we believe that the adequacy of Lichtenstein's notice is a question of fact.

We begin by noting several facts that are not in dispute. First, Lichtenstein's mother suffered a sudden, severe, and unexpected health condition on January 3, 2008 that required staying at the hospital for over a week. As such, Lichtenstein's mother suffered a "serious health condition" that entitled Lichtenstein to take FMLA leave on January 3rd. *See* 29 U.S.C. § 2611(11) (defining "serious health condition" as a physical condition that requires "inpatient care"); 29 C.F.R. § 825.114 (defining "inpatient care" as "an overnight stay in a hospital"). Second, Lichtenstein correctly followed UPMC's call-off procedure by calling UPMC's nursing supervisor soon after arriving at the emergency room. This is sufficient to establish a genuine dispute about whether Lichtenstein notified UPMC "as soon as [was] practicable under the facts and circumstances."[15] 29 C.F.R. § 825.303(a).

---

[15] Although UPMC argues in its brief that Lichtenstein failed to give "advance notice" of her leave, br. at 34, this is belied by the unforeseeable nature of the emergency and UPMC's previous admissions that Lichtenstein followed proper procedure by calling the nursing supervisor when she did.

Finally, during Lichtenstein's telephone call with the nursing supervisor, Lichtenstein conveyed the following facts: (1) she was "currently in the *emergency room*," (2) her "mother had been brought into the hospital via *ambulance*," and (3) she "would be *unable* to work that day" (emphases added).

### (a) "Serious Health Condition"

The District Court concluded that Lichtenstein conveyed insufficient information to the nursing supervisor to place UPMC on notice. According to the District Court, the information was inadequate because "the fact that a family member has been taken to the emergency room *does not necessarily* reflect a serious medical condition sufficient to support a request for leave under the FMLA." *Lichtenstein*, 805 F. Supp. 2d at 203 (emphasis added). "While the condition precipitating an emergency room visit *may* be serious," the District Court reasoned that "the condition *might not* require ongoing hospitalization or medical treatment." *Id.* (emphases added). In so reasoning, the District Court answered the wrong question. The question is not whether the information conveyed to the employer necessarily rules out non-FMLA scenarios. The question is whether the information allows an employer to "*reasonably* determine whether the FMLA *may* apply." 29 C.F.R. § 825.303(b) (emphases added). Reasonableness does not require certainty, and "may" does not mean "must." It does not matter that a person rushed by ambulance to the emergency room "might not" require inpatient care as defined under the FMLA. Since many people in this situation *do* require such

21

care, a jury might find that reasonable notice was given under the circumstances.[16]

Finally, in considering the adequacy of Lichtenstein's notice, we find it instructive to compare the information she conveyed with the guidance provided in 29 C.F.R. § 825.303(b).[17] According to this regulation, an employee

---

[16] Despite the dissent's characterization to the contrary, our reasoning here does not dictate that a question of fact necessarily exists whenever an employee "calls out from work saying she needs to go to the hospital." Lichtenstein did not merely give a generic reference about going to a hospital; she specifically told UPMC that her mother had been taken to the *emergency room* in an *ambulance*. As common sense would suggest, people rushed to the emergency room in an ambulance are generally in a more serious health situation than people who go on their own accord. In fact, data from the United States indicate that about forty percent of people taken to the emergency room in an ambulance are admitted for inpatient care, versus just ten percent of those who "walk in." *See* Gregory Luke Larkin, et al., *National Study of Ambulance Transports to United States Emergency Departments: Importance of Mental Health Problems*, 21 PREHOSPITAL & DISASTER MED. 82, 85 tbl.1 (2006). We are not presented, therefore, with the kind of vague, generic reference to a "hospital" in which the likelihood of a serious health condition is merely conceivable but not sufficiently likely to warrant shifting the burden of inquiry onto the employer.

[17] The Department of Labor has described this regulation as "provid[ing] additional guidance for employees regarding

whose family member has a serious health condition may provide adequate notice by stating that the "family member is under the continuing care of a health care provider," or, that the family member has a condition that renders her "unable to perform daily activities." *Id.* A trier-of-fact could reasonably conclude that the information conveyed by Lichtenstein did both. Lichtenstein stated that her mother was still at the hospital, which implies "continuing care,"[18] and it could be reasonably inferred that a person brought by ambulance to an emergency room and remaining at the hospital is "unable to perform daily activities."

Of course, a trier-of-fact could also consider Lichtenstein's failure to provide any further information to UPMC about her mother's condition when she returned to work the very next day. Lichtenstein was not necessarily obligated, however, to provide additional information. The regulations state that if an employee's initial notice reasonably apprises the employer that FMLA may apply, it is the employer's burden to request additional information if

what is 'sufficient information'" to constitute notice. U.S. Dep't of Labor, *Frequently Asked Questions and Answers About the Revisions to the Family and Medical Leave Act*, http://www.dol.gov/whd/fmla/finalrule/NonMilitaryFAQs.htm (last visited July 9, 2012).

[18] Since the regulation refers to "continuing care" rather than "continuing treatment," the DOL's definition of "continuing treatment" is not necessarily applicable. *See* 29 C.F.R. § 825.115(a) (stating that "continual treatment" requires "[a] period of incapacity of more than three consecutive, full calendar days").

necessary. 29 C.F.R. § 825.303(a). Thus, since we believe there is a genuine dispute about whether Lichtenstein's phone call to the nursing supervisor met this standard, her failure to provide further information on the following day at work does not defeat her claim at this stage.

### (b) "To Care For"

UPMC contends that Lichtenstein's notice was deficient because it failed to provide sufficient information from which UPMC could infer she would "care for" her mother. UPMC's arguments on this issue wholly miss the point. As previously stated, FMLA regulations define the term "to care for" as "encompass[ing] both physical and psychological care," including the provision of "psychological comfort and reassurance which would be beneficial to a . . . parent with a serious health condition who is receiving inpatient or home care." 29 C.F.R. § 825.124(a). We assess the adequacy of Lichtenstein's notice, therefore, by considering whether UPMC could have reasonably inferred she would provide "psychological comfort and reassurance" to her mother.

UPMC claims that Lichtenstein "provided no indication that she was needed to care for her mother—only that her mother had been transported to the hospital." Br. at 36. It is undisputed, however, that Lichtenstein told UPMC she was "currently in the emergency room" with her mother and "unable to work that day." A reasonable fact-finder could infer from these statements that Lichtenstein was asking for leave to care for her mother. UPMC implicitly conceded this point at oral argument when it stated that staying and caring for one's mother under such circumstances

"would be a natural thing to do." If it was "a natural thing to do," it was certainly reasonable for UPMC to infer. It matters not that UPMC received no "doctor's opinion or report that the mother for some emotional reasons required the presence of the plaintiff at the hospital." An employer does not need a doctor's report to realize that a person rushed to the hospital in an ambulance will likely receive "psychological comfort and reassurance" by the presence of their loved ones. *See Fioto v. Manhattan Woods Golf Enterprises, LLC*, 270 F.Supp.2d 401, 405 (S.D.N.Y. 2003) ("By the very terms of the FMLA regulations, a child's offering comfort and reassurance to a bedridden parent qualifies as 'caring for' the parent.").

Similarly it does not matter that UPMC did not know if Lichtenstein was an "only child," or if there were "other family members" at the hospital.[19] The FMLA regulations expressly state that "[t]he employee need not be the only individual or family member available to care for the family member." 29 CFR § 825.124(b); *see also Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 840–41 (6th Cir. 2012) (stating that "plain language of the regulations" entitles an employee to FMLA leave even when other relatives are available to care for the sick family member).

---

[19] At oral argument, UPMC argued that it could not have been expected to know that Lichtenstein would take care of her mother because "there's no evidence in this record that the plaintiff is an only child, that there's no other family members there, who else was at the hospital to give nurture, or any of that type of information."

Finally, there is no merit to UPMC's argument that Lichtenstein's January 8th letter made it reasonable for UPMC to infer that Lichtenstein did not provide care for her mother on January 3rd. The logic of UPMC's argument is as follows: (A) since Lichtenstein's January 8th letter stated that she needed to care for her mother *after* her mother left the hospital, ergo (B) "she wasn't needed to care for her mother while her mother was in the hospital." There is nothing inherently contradictory, however, about asking to care for one's seriously ill parent both during *and* after their hospital stay. Indeed, the FMLA regulations expressly define "to care for" as including both care provided at home *and* the hospital. *See* 29 C.F.R. § 825.124(a) (stating that care includes "providing psychological comfort and reassurance which would be beneficial to a . . . parent with a serious health condition who is receiving *inpatient* or *home* care" (emphases added)). UPMC's logic thus relies on a cramped notion of what it means "to care for" under the FMLA.

For the reasons stated, a genuine factual dispute exists about whether Lichtenstein provided adequate notice to timely and reasonably apprise UPMC that the FMLA may apply to her request for leave. A trier-of-fact considering this question would be entitled to consider the "totality of the circumstances," *Rynders v. Williams*, 650 F.3d 1188, 1196 (8th Cir. 2011), including—but not limited to—evidence shedding light on Lichtenstein's credibility and Lichtenstein's pattern of conduct during and following January 3rd, including her failure to mention her mother's condition when she returned to work on January 4th as well as her email to Lidey on January 8th.

## 2.    Causation

Having determined that a genuine factual dispute exists with respect to the notice prong of Lichtenstein's prima facie case, we now consider the question of causation. To demonstrate a prima facie case of causation, Lichtenstein must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000). When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Id.* (quoting *Farrell*, 206 F.3d at 280).

Here, Lichtenstein was terminated on January 10th, just seven days after she invoked her right to FMLA leave, and just three days after Lidey returned from vacation. Had things gone according to UPMC's plan, even less time would have elapsed. Both Lidey and Brown testified that Lidey's plan was to fire Lichtenstein on January 8th (the first day Lidey and Lichtenstein were scheduled to work the same shift following Lidey's return from vacation). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," *id.* at 233, the temporal proximity in this case is in the realm of what this Court and others have found sufficient at the prima facie stage, *see, e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding two days unduly suggestive); *Seeger v. Cincinnati Bell Tel. Co.*, 681

27

F.3d 274, 283 (6th Cir. 2012) (three weeks); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (four days); *cf. McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (five days in Title VII retaliation case).

Even if the temporal proximity in this case is not unduly suggestive, there is other evidence from which an inference of causation can be drawn. UPMC's position statement to the EEOC, for example, specifically listed Lichtenstein's January 3rd leave as one of her three absences. Since UPMC's position statement stated that Lichtenstein's attendance problems were one of the reasons it terminated Lichtenstein, a trier-of-fact could infer that UPMC considered Lichtenstein's January 3rd absence as a negative factor in its termination decision. This inference is supported by other evidence in the record. Specifically, when Lidey returned to work on January 7th, she responded to Krautz's email (the one in which Krautz reported Lichtenstein's call-off on January 3rd) by requesting Lichtenstein's call-off records from Harris. From this, a trier-of-fact could infer that Lidey's decision to request Lichtenstein's call-off records, and ergo Lidey's decision that day to terminate Lichtenstein, was triggered by Lidey learning of the January 3rd absence.

We recognize that since Krautz's email made no mention of Lichtenstein's reason for calling off, it does not necessarily follow that Lidey knew Lichtenstein's absence was likely protected under the FMLA. *Cf. Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) ("To the extent that [Title VII plaintiff] relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, he will have to show as well that the decision maker had knowledge of the protected

activity." (internal citations omitted)). There is other evidence in the record, however, from which this inference could reasonably be drawn. *See Cavaliere*, 2012 WL 525891, at *12 (finding plaintiff's circumstantial evidence sufficient to infer decision maker's awareness of her FMLA leave). Most tellingly, Lidey received a personal email from Lichtenstein the following day which explicitly stated that Lichtenstein's mother had been hospitalized on January 3rd and had remained hospitalized ever since. Moreover, Lichtenstein's staff log—which Lidey requested and received from Harris on both January 7th and 9th—included a notation that Lichtenstein missed work on the 3rd because of her "sick mom." Taken together, these two facts provide a sufficient basis from which to infer that by the time Lidey terminated Lichtenstein, she was on notice that Lichtenstein's January 3rd absence may be protected under the FMLA.

Although Lidey now claims she never read Lichtenstein's email nor saw the "sick mom" notation on the staff log, a reasonable trier-of-fact could find these claims unworthy of credence. First, Lidey did not merely receive Lichtenstein's email; she replied to it. Second, Lidey did not merely receive the staff log, she specifically requested it—not once, but twice. Third, Lidey's insistence that she did not know of Lichtenstein's mother's illness[20] is directly

---

[20] In her deposition, Lidey stated: "I terminated Jamie by telephone [on January 10, 2008] before I knew anything about her mom being ill or needing to ask for leave." App. at 335. When confronted with the email she received from Lichtenstein that contained this information, Lidey testified, "I did not see that." *Id.* When confronted with the fact that she twice requested and received Lichtenstein's staff log

29

contradicted by Brown's deposition. According to Brown: "What I recall [Lidey] saying was that Jamie was stating that she needed to be off to care for her mother." App. at 424. Thus, even if there is insufficient evidence to show Lidey's knowledge of Lichtenstein's protected activity when she returned to work on January 7th, any benefit of this ignorance was lost when Lidey received Lichtenstein's email the next day.[21] *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]he plaintiff must generally show that the decision maker was aware of the protected conduct *at the time of the adverse employment action*." (emphasis added)).

In its brief, UPMC argues that any inference of causation is defeated by Lidey's claim that she decided to terminate Lichtenstein prior to January 3rd. This argument is unavailing because, as discussed below in our analysis of pretext, Lichtenstein has established a genuine dispute about the date of UPMC's termination decision and whether it occurred before or after January 3rd.[22] UPMC claims, for

(which contained the note about Lichtenstein's mother being sick on January 3rd), Lidey responded, "[i]t doesn't mean that I looked at that, and I was, I don't believe I looked at it at that point in time." *Id.*

[21] Although Lichtenstein's email did not specifically state that she missed work on January 3rd because of her mother's hospitalization, Lidey was aware from the staff log that Lichtenstein's January 3rd absence was a result of her mom being sick.

[22] A similar limitation applies to the District Court's causation analysis, the conclusion of which was dictated by its finding

example, that Lidey decided to fire Lichtenstein for arriving late and leaving early on December 30th. UPMC's position statement to the EEOC, however, made no mention of this incident as a factor in its decision, and Lidey could not even recall when she learned about it. A trier-of-fact could infer from this that UPMC did not discover the December 30th incident until sometime *after* Lichtenstein's termination. A post hoc ground for termination, while potentially relevant to the calculation of damages, is "irrelevant" to the question of causation. *Brenneman*, 366 F.3d at 416 n.2. Accordingly, at this stage, UPMC does not benefit from the principle that employers need not suspend plans to discipline an employee upon discovering that said employee engaged in protected activity on matters unrelated to the contemplated action. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (establishing this principle in the Title VII context); *Salameh v. Sears Holding Mgt. Corp.*, No. 08 C 4372, 2010 WL 183361 (N.D. Ill. Jan. 13, 2010) (applying principle to the FMLA context).

For all of the abovementioned reasons, we believe Lichtenstein has presented sufficient evidence to establish a

---

that Lichtenstein had not invoked her right to FMLA leave on January 3rd. Since this removed Lichtenstein's January 3rd absence from FMLA's protections, the District Court regarded any and all considerations of this absence irrelevant to causation. Thus, because "the wheels of [Lichtenstein's] termination were already in motion" by January 8th, the District Court concluded that Lichtenstein failed to demonstrate a causative link. *Lichtenstein*, 805 F. Supp. 2d at 213.

prima facie case of causation. This evidence, when drawing all reasonable inferences in Lichtenstein's favor, is sufficient for a fact-finder to conclude: (1) Lidey's decision to terminate Lichtenstein was triggered by the January 3rd absence; (2) prior to terminating Lichtenstein, Lidey learned that the January 3rd absence was likely taken for an FMLA-qualifying reason; and (3) by proceeding with the termination, Lidey considered Lichtenstein's FMLA activity a "negative factor" that further justified the termination.

### 3.  Pretext

We now address the legitimate, non-discriminatory reasons that UPMC has articulated for terminating Lichtenstein and consider whether Lichtenstein has established reasonable doubt that this proffered justification is mere pretext for retaliation.

According to UPMC, Lichtenstein was terminated because of her chronic tardiness and absenteeism, with the "last straw" being her late appearance and early departure on December 30th. Br. at 43. Specifically, UPMC states that:

> [T]he decision to terminate Plaintiff's employment was made after Plaintiff, despite being expressly told that she was to report for her scheduled shift on December 30, 2007, decided to make her own schedule by arriving very late and leaving very early. In fact, the decision was made prior to Ms. Lidey leaving the office for vacation on December 30, 2007. Indeed, Ms. Lidey spoke to Helene Brown about the decision to terminate Plaintiff prior to January 1, 2008

32

and Ms. Brown concurred in that decision.

*Id.* at 15 (internal citations omitted).  UPMC thus claims that "[n]either the January 3, 2008 nor January 8, 2008 absences were taken into account" in the termination decision.  *Id.*

In order to demonstrate that UPMC's proffered justification for terminating her is merely pretextual, Lichtenstein "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.  To do so, Lichtenstein "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [UPMC's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* at 765.  Notwithstanding the District Court's conclusion to the contrary, we believe Lichtenstein has met this burden.  To begin with, Lichtenstein has presented evidence that contradicts UPMC's two key assertions that (1) the December 30th incident was the "final" straw that triggered Lichtenstein's termination, and (2) Lidey made the termination decision prior to Lichtenstein's absence on January 3rd.

First, while UPMC claims that the December 30th incident was the "final straw" triggering Lichtenstein's termination, a trier-of-fact could reasonably infer that UPMC was not even aware of this incident prior to terminating Lichtenstein.  This inference can be drawn from the following evidence: (A) Lidey could not recollect when she first learned about the December 30th incident, (B) UPMC did not cite the incident as a factor in the termination decision in its

33

explanation to the EEOC; and (C) the incident was not included in Lichtenstein's staff log that Lidey can be inferred to have reviewed prior to firing her.

Second, the only evidence showing Lidey decided to fire Lichtenstein prior to going on leave is Lidey's own testimony. This is important because Lidey contradicted herself on this very point. At least *twice* during her deposition Lidey stated that she couldn't recall if she made the termination decision prior to going on vacation. Similarly, although Lidey stated that she always spoke with Brown prior to firing an employee, she testified at least *three* times during her deposition that she could not recall if she spoke with Brown before or after going on vacation. These contradictions go to the very core of UPMC's proffered reason for terminating Lichtenstein. They also "raise suspicions" about Lidey's credibility. *See Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997) ("An inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility . . . ."). Not only did Lidey repeatedly contradict herself on the timing of her decision, substantial evidence contradicts her assertion that she did not know Lichtenstein's mother was ill.[23] Since

---

[23] This evidence includes: (1) Brown's testimony that Lidey told her about Lichtenstein's mother's illness prior to terminating Lichtenstein, (2) Lidey's request and receipt of Lichtenstein's staff log in which the words "sick mom" were clearly written in the entry for the January 3rd absence, and (3) Lidey's receipt of and reply to Lichtenstein's email in which Lichtenstein had discussed her mother's hospitalization.

Lidey's testimony is the *only* evidence showing that the termination decision was made prior to January 3rd, a trier-of-fact would be justified in giving this evidence little evidentiary weight.

In the opinion below, however, the District Court reasoned that Lidey's contradictions were immaterial because they merely pertained to the *timing* of UPMC's decision (i.e., whether Lidey made the decision before or after she went on vacation), not to her proffered *justification* for doing so (i.e., Lichtenstein's attendance and scheduling problems). According to the District Court, "Ms. Lidey's testimony does not offer inconsistent *reasons* for Ms. Lichtenstein's termination; the reason is consistently her attendance and scheduling problems."[24] *Lichtenstein*, 805 F. Supp. 2d at 209. The District Court's reasoning is flawed. The question is not whether UPMC discharged Lichtenstein for absenteeism and tardiness; the question is whether Lichtenstein's FMLA-qualifying leave on January 3rd was a "negative factor" that hastened her termination. 29 CFR § 825.220(c); *see also Cavin*, 346 F.3d at 726 ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA." (internal quotation marks omitted)). The timing of UPMC's decision is thus critical to determining whether UPMC relied solely on the pre-January 3rd incidents, or whether it also considered the January 3rd absence as an additional negative factor.

---

[24] The District Court reasoned that Lidey's testimony "is not so much inconsistent as it is vague as to the date on which certain events took place three years earlier." *Lichtenstein*, 805 F. Supp. 2d at 209.

The importance of timing to the question of pretext was illustrated by the Seventh Circuit in *Kohls v. Beverly Enterprises Wisconsin, Inc*., 259 F.3d 799 (7th Cir. 2001). In *Kohls*, the employee engaged in behavior prior to taking FMLA leave that was clearly sufficient to warrant her termination. 259 F.3d at 805. The Seventh Circuit noted, however, that there was "an additional twist" to the case because the employer "did not decide to fire Kohls until some time after she took leave." *Id.* This was important, the Seventh Circuit explained, because:

> We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).

*Id.* at 806. Although the Seventh Circuit affirmed summary judgment for the employer, it did so because the record was "clear" that "the employer *did not discover* many of the deficiencies in [the employee's] work . . . until *after* [the employee] took leave." *Id.* (emphases added).

As with the employee in *Kohls*, Lichtenstein engaged in behavior that was undoubtedly sufficient for UPMC to terminate her employment (i.e., attendance and scheduling problems during a probationary period in which a progressive disciplinary policy did not apply). In sharp contrast, however, to the situation in *Kohls*, the record here is clear (with the exception of the December 30th incident) that

36

UPMC was aware of Lichtenstein's performance deficiencies *prior* to her taking leave on January 3rd. Despite this knowledge, UPMC did not fire Lichtenstein until after she took her January 3rd leave. Although UPMC insists that the timing can be explained by the simple fact that Lidey left for vacation on December 31st and did not have an opportunity to fire Lichtenstein prior to January 3rd, Lidey's own testimony raises significant doubts about this explanation. Indeed, Lidey herself could not remember when she made the decision to terminate Lidey, nor could she remember when she learned of the December 30th incident that purportedly prompted this decision.

We believe, therefore, that Lichtenstein has met her burden of demonstrating pretext because, as per the Seventh Circuit's reasoning, "the timing of [UPMC's] decision could lead a fact finder to infer that [Lichtenstein] would not have been fired absent her taking of leave." *Id.*; *accord Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488–90 (6th Cir. 2005) ("The record . . . shows that [the employer] was aware of many of Moorer's alleged performance deficiencies prior to his FMLA leave, thereby casting doubt on the timing of the purported reasons for his termination.").

**B.    INTERFERENCE**

By terminating her employment for having invoked her right to FMLA leave, Lichtenstein argues UPMC unlawfully interfered with her rights in violation of 29 U.S.C. § 2615(a)(1). *See Erdman*, 582 F.3d at 509 ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as

retaliation against the employee.").[25]  To prevail on her interference claim, Lichtenstein must show (1) she was entitled to take FMLA leave on January 3rd and/or January 8th, and (2) UPMC denied her right to do so.  *See Callison*, 430 F.3d at 119.

In proving that UPMC interfered with her rights, Lichtenstein does not need to prove that UPMC acted with discriminatory intent.  *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006); *Callison*, 430 F.3d at 120.  The FMLA, however, "does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."  *Sarnowski*, 510 F.3d at 403.

---

[25] It is not clear to us that *Erdman* necessarily guarantees that plaintiffs have an automatic right to claim interference where, as here, the claim is so clearly redundant to the retaliation claim.  In recent years, several federal courts of appeals have affirmed dismissal of interference claims that— although not necessarily analogous to Lichtenstein's claim here—were duplicative of the plaintiffs' retaliation claims.  *E.g.*, *Lovland*, 674 F.3d at 811–12; *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 282–83 (6th Cir. 2012); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006); *see also Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) ("[Plaintiff's] interference claim is identical to his retaliation claim, and premised on the same allegation . . . .  He cannot escape the *McDonnell Douglas* analysis to prove his case merely by affixing an 'interference' label to one of his duplicative claims.  Thus, [plaintiff's] FMLA violation allegations should be analyzed as a retaliation claim.").  Since this issue was not raised below nor presented on appeal, we do not address it here.

UPMC, therefore, can defeat Lichtenstein's claim if it can demonstrate that Lichtenstein was terminated for reasons "unrelated to" her exercise of rights. *Id.*; *accord Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) ("If there exists a showing of interference, the burden shifts to the employer to prove there was a reason unrelated to the employee's exercise of FMLA rights for terminating the employee."); *Michniewicz v. Metasource, LLC*, 756 F.Supp.2d 657, 666 (E.D. Pa. 2010) ("The employee bears the initial burden of showing both elements of the interference claim, and then the burden shifts to the employer . . . ."). Whether or not UPMC will be able to meet its burden, we have no trouble concluding—for the reasons set forth in our retaliation analysis above—that Lichtenstein has met her burden at this stage in the litigation.

## V.    CONCLUSION

For the foregoing reasons, we will vacate the District Court's grant of summary judgment to UPMC on both the retaliation and interference claims and remand to the District Court for proceedings consistent with this opinion.

AMBRO, Circuit Judge, Dissenting

Pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, an employee may qualify for unforeseen FMLA leave only by providing an employer with notice that contains "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(c). Congress included this notice requirement in order to balance the employee's entitlement to "reasonable leave" with the "legitimate interests of employers." 29 U.S.C. § 2601(b)(2); *see Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951 (7th Cir. 2004) (Posner, J.) ("Conditioning the right to take FMLA leave on the employee's giving the required notice to his employer is the quid pro quo for the employer's partial surrender of control over his work force."). In keeping with the purpose and language of the FMLA, I would hold as a matter of law that Ms. Lichtenstein failed to provide adequate notice that the FMLA applied to her January 3, 2008 absence, and I would affirm the District Court's grant of summary judgment to the University of Pittsburgh Medical Center ("UPMC"). For the reasons given below, and despite Judge Van Antwerpen's well-crafted opinion, I respectfully dissent.

For her interference and retaliation claims to survive summary judgment, Lichtenstein must introduce evidence that she was entitled to FMLA benefits. *Hayduk v. City of Johnstown*, 386 F. App'x 55, 60 (3d Cir. 2010) ("[T]he first elements of both theories [*i.e.*, interference and retaliation] are essentially identical: a plaintiff . . . must establish, among other things, that he had a right to FMLA benefits."). To establish that entitlement, Lichtenstein must demonstrate that she gave her employer adequate notice of the need for FMLA leave. *See id.* Federal regulations require that an employee "state a qualifying reason for the needed leave." 29 C.F.R.

1

§ 825.301(b).  When the need for leave is unforeseeable, employees must give notice "as soon as practicable under the facts and circumstances of the particular case" and according to the employer's "usual and customary notice and procedural requirements."  *Id.* § 825.303(a) & (c).  The employee "need not expressly assert rights under the FMLA or even mention the FMLA," but must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  *Id.* § 825.303(b).  *Compare Sarnowski v. Air Brook Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) ("In providing notice, the employee need not use any magic words."), *with Hayduk v. City of Johnstown*, 580 F. Supp. 2d 429, 471 (W.D. Pa. 2008) ("The FMLA does not require an employer to be clairvoyant." (quoting *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 428 (6th Cir. 2004)).  The employer may have a duty to "inquire further . . . to ascertain whether leave is potentially FMLA-qualifying," 29 C.F.R. § 825.301(a), but that duty only arises when the employee provides adequate notice.  *See Wilson v. Lemington Home for the Aged*, 159 F. Supp. 2d 186, 192 (W.D. Pa. 2001); *De Luca v. Trs. of Univ. of Pa.*, 834 F. Supp. 2d 282, 293 (E.D. Pa. 2011).

Lichtenstein contends that she gave proper notice when she called off on January 3 and told the nursing supervisor, "I was currently in the emergency room, that my mother had been brought into the hospital via ambulance, and I would be unable to work that day."  I agree with my colleagues that the notice issue is generally a question of fact and "the critical test is not whether the employee gave every necessary detail to determine if the FMLA applies, but how the information conveyed to the employer is reasonably interpreted."  *Id.* at 16 (quotation marks & citation omitted).  However, I cannot agree that "genuine factual disputes exist about whether Lichtenstein's notice was adequate."  Maj. Op. at 21.

2

Lichtenstein did not state a qualifying reason for her January 3 absence because she failed to mention essential details that were critical for adequate notice, namely the seriousness of her mother's condition and her mother's need for care. Lichtenstein conveyed to UPMC that her mother was at the hospital, but not that her mother was suffering from a serious health condition. According to the majority, Lichtenstein's notice might have been sufficient because "many people in [her mother's] situation *do* require [FMLA-qualifying] care." Maj. Op. at 19 (emphasis in text). This view imposes on employers a much broader obligation than, I believe, the FMLA requires.

Consider, for example, an employee who calls out from work saying she needs to go to the hospital. Whether that employee is going to the hospital for an emergency procedure, a routine check-up, or just to pick up a friend, the majority's reasoning dictates that the notice cannot be designated inadequate as a matter of law because "many people in this situation" require care for a serious health condition. Indeed, simply calling out "sick" would qualify as sufficient notice under the majority's reading of the FMLA had the Department of Labor not adopted an explicit rule to the contrary. *See* 29 C.F.R. § 825.303(b). "If you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the Act requires." *Aubuchon*, 359 F.3d at 952.[1] The majority's lenient reading

---

[1] The Seventh Circuit Court requires that an employee's notice "give the employer enough information to establish probable cause, as it were, to believe that he is entitled to FMLA leave." *Id.* at 953; *but see Scobey v. Nucor Steel-Ark.*, 580 F.3d 781, 788 (8th Cir. 2009) (applying a more lenient notice standard). I do not address whether that is the appropriate standard to apply to notice questions in FMLA

3

of the notice requirement distorts the balance Congress and the Department of Labor struck between employee and employer interests, and improperly "place[s] a substantial and largely wasted investigative burden on employers." *Id.* at 953.

Lichtenstein also conveyed to UPMC that she needed the day off, but not that the day off was necessary to care for her mother. Though UPMC conceded that caring for one's mother under such circumstances "would be a natural thing to do," Maj. Op. 21, empathy cannot make up for Lichtenstein's failure to mention an FMLA-qualifying reason for her absence. *See Aubuchon*, 359 F.3d at 952 ("Wanting to stay home with one's wife until she has the baby, while understandable, is not the same thing as wanting to stay home to care for a spouse who has a serious health condition.").

In addition to omitting critical details from her statements to the nursing supervisor, Lichtenstein failed to provide notice "as soon as practicable." *See* 29 C.F.R. § 825.303(a). She returned to work on January 4—while her mother was still in the hospital—and did not notify a supervisor about her mother's serious health condition. Lichtenstein even testified at her deposition that she first asked for FMLA leave on January 8, not January 3. App. at 66 ("The first time that I asked [for leave] . . . [w]as January 8 of 2008."). Even if her request for leave on January 8 was made "as soon as practicable," which it was not, the direct evidence in the record indicates only that the decision was made to terminate Lichtenstein *before* the 8th. *See* App. at 345 (Lidey testifying that the decision was made "before New Year's"); 423-424 (Brown testifying that the decision "had to be [made] prior to January 8th"). Lichtenstein argues that the

cases, but we should be aware of the important considerations that led the Seventh Circuit to adopt it.

4

decision may have been made "on or after January 7," Lichtenstein Br. at 17, but she only cites non-probative circumstantial evidence to support her claim. *See id.* at 14 (citing App. at 331 (Lidey testifying that she "discussed [Lichtenstein's call-offs] with Human Resource" on January 7)). Lichtenstein cites no direct evidence that the decision was made after the 8th and does not address Brown's testimony.

There are situations in which an employee provides sufficient notice to trigger an employer's duty to inquire, but this is not one of them. *See Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 978-91 (5th Cir. 1998) (rehearing and rehearing en banc denied) (holding, as a matter of law, that an employee's statement that she "was having a lot of pain and . . . wouldn't make it in to work that day" provided insufficient notice to her employer under the FMLA). That Lichtenstein's statements might reasonably be construed as providing adequate notice is a bridge too far. If notice is adequate when an employer can "reasonably determine whether the FMLA may apply," 29 C.F.R. § 825.303(c), then we should find that notice is inadequate when, as in this case, an employee omits vital pieces of information that would distinguish FMLA leave from an ordinary absence.

If Lichtenstein's statements could reasonably be interpreted as sufficient notice of her need for FMLA leave, I would join my colleagues and reverse the grant of summary judgment. However, I believe that the statements are insufficient as a matter of law. Thus I respectfully dissent.

5