NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3667
_____

AUDREY E. SCOTT,

Appellant

v.

UPMC, d/b/a UNIVERSITY OF PITTSBURGH MEDICAL CENTER

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 2-09-cv-01475)
District Judge:  Honorable Arthur J. Schwab
_____

Submitted Under Third Circuit LAR 34.1(a)
June 21, 2011
_____

Before:  BARRY, AMBRO, and COWEN, Circuit Judges

(Opinion filed : July 1, 2011)
_____

OPINION
_____

AMBRO, Circuit Judge

        Plaintiff-appellant Audrey Scott sued Defendant University of Pittsburgh Medical

Center (UPMC) alleging violations of the Family and Medical Leave Act (FMLA), 29

U.S.C. § 2601 *et seq*. The District Court granted summary judgment to UPMC, and Scott appealed. We affirm the District Court.

## I.    Background

In June 2008, Scott accepted a full-time job as a housekeeper at UPMC's South Side facility. She worked the third shift (from approximately 10:30 p.m. until 6:30 a.m.) in order to accommodate her part-time job at a concession stand at PNC park, where she worked during the Pittsburgh Pirates' home games.

In November 2008, Scott had a cyst removed from her back, and then she had two cataract surgeries in early 2009. These procedures required her to take time off work, which she requested and was granted. Additionally, she was at least once advised of her rights under the FMLA in connection with at least one of these leaves. Those surgeries and accompanying leaves took place largely without incident, and Scott remained an employee in good standing when, in June 2009, she was transferred to UPMC's Mercy Hospital.

On July 1, Scott went to her primary care physician, reporting that the scar left by the cyst removal surgery had become painful, particularly when she was required to push or pull objects during the workday at UPMC-Mercy. Her physician referred her to Dr. Castillo, who had performed the cyst removal, and he met with Scott the following day. Dr. Castillo advised Scott that she would eventually need additional surgery to remove the painful scar tissue, and that she should limit herself to "light duty" at work for the following four weeks. However, he did not initially define light duty.

Scott reported to work that evening and informed her supervisor of her work restriction. However, there was no light duty work available, and Scott was sent home. On July 6, Sue Hale, a supervisor at UPMC-Mercy, directed Scott to communicate with Work Partners, a company responsible for administering UPMC's various leave programs. Scott called Work Partners the next day, and was informed that she would receive FMLA leave paperwork, which she should fill out and return. Unfortunately, this paperwork was misaddressed and Scott neither received it nor requested that it be re-sent.

Shortly thereafter, Dr. Castillo reviewed a copy of Scott's job description, which included a list of ten duties. Above one of the duties—"[m]ove equipment, furniture, boxes, wash walls, spot carpets, etc. as assigned"—he wrote "[c]annot lift anything more than 25 lbs." (Emphasis in original.) Scott hand-delivered a copy to the office of Jack Grandy, UPMC-Mercy's director of housekeeping, patient transport, and laundry. Grandy was not present at the time, but his assistant told Scott that UPMC-Mercy would have to receive paperwork from Work Partners before she could return to work.

On July 15, Grandy left a voicemail for Scott in which he informed her that she should report to work during the second shift (from 3:00 p.m. until 11:00 p.m.) the following day because her request for light duty could be accommodated then.[1] Scott returned the call, but could not reach Grandy. However, she told his assistant that she had a scheduling conflict because of her job at PNC Park. On July 16, Scott neither reported to work nor communicated with Grandy.

---

[1] In contrast, Scott's request for light duty work could not be accommodated on the third shift, when she usually worked.

3

On July 21, and at the request of Work Partners, Dr. Castillo provided more detailed information about Scott's work restrictions. He indicated that she could "occasionally" lift, carry, push, or pull zero to fifty pounds, but never more than that. He also indicated that she could perform "light duty," which was defined as "[m]aximum lifting of up to 20 lbs. with frequent lifting/carrying of up to 10 lbs. or a negligible amount; significant walking or standing may be required or may involve sitting with a degree of pushing and pulling." About the same time,[2] a representative of Work Partners phoned Scott, who stated that she had never received FMLA paperwork, and that she had been told to return to work on the second shift but could not work that shift. The representative reportedly promised to speak with Grandy about this situation and to get back to Scott about her FMLA paperwork.

On July 24, Scott received a letter from Grandy. Among other things, the letter stated that Scott had failed to report to work on July 16, 17, 20, 21, and 22, and requested that she communicate with Grandy no later than July 27 to advise him whether she intended to remain in UPMC's employ. However, Scott did not respond to Grandy, instead relying on Work Partners' commitment to phone Grandy on her behalf.

On August 4, Work Partners wrote to Scott, stating in part that a representative had attempted to reach her the day before in order to instruct her to return to work on the second shift. The letter also stated that "Work Partners has not yet received medical records from your treating provider that support your need for modified duty work at this

---

[2] The record is unclear as to when this call took place; it may have occurred as late as July 24.

4

time," and threatened that if Scott failed to return to work she may be subject to "disciplinary action as outlined in the UPMC Time and Attendance Policy." Supp. App. 123. The same day, Work Partners requested additional information from Dr. Castillo.

Shortly thereafter, Work Partners denied Scott's claim for light duty. Additionally, UPMC terminated Scott's employment, effective July 2, for failure to report to work. However, Work Partners' evaluation of whether she was entitled to FMLA leave apparently continued, as it requested more documentation in a letter dated September 14. It denied FMLA leave on September 29.

Scott sued UPMC, contending that it violated her rights under the FMLA by firing her despite her entitlement to leave, and retaliating against her for asserting her right to leave. During discovery, however, Scott stated that she had never asked for time off, and that she "didn't need time off." Supp. App. 22. After discovery, the District Court granted summary judgment to UPMC based on the Court's conclusion that Scott had failed to establish she was entitled to protection under the FLMA because she did not suffer from a "serious health condition." Scott timely appealed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment *de novo*. *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011). We may "affirm the District Court's judgment on any basis found in the record." *Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010).

5

### III.    Analysis

The FMLA was enacted to "entitle employees to take reasonable leave for medical reasons" "in a manner that accommodates the legitimate interest of employers." 29 U.S.C. § 2601(b)(2) & (3). It achieves this objective by, among other things, requiring covered employers to grant 12 weeks of unpaid leave to any eligible employee suffering from a serious health condition.

However, in order to invoke FMLA protection, an employee must first notify her employer of her need for leave. Under the relevant regulation,

> [a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave . . . . [T]he employee need not expressly assert rights under the FMLA or even mention the FMLA.

29 C.F.R. § 825.302(c).

This is not a high bar. "An employee who does not cite to the FMLA . . . may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007). Nonetheless, we conclude that Scott has failed to show a dispute of material fact as to whether her request for light duty was sufficient to apprise UPMC of her need for FMLA leave. *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (whether employee put employer on notice of need for FMLA leave is question of fact).

The applicable regulation requires employees to notify their employers that they need leave—time off work—and not simply that they need a modification of their duties.

6

Here, however, it is undisputed that Scott asked only for "light duty," not leave.[3] Then, when Grandy offered her light duty (albeit on an undesirable shift), she failed to reply to his various messages, much less inform him that she had changed her mind by deciding to request leave instead of light duty.[4] As a matter of law, this was insufficient to place Grandy on notice of Scott's possible need for FMLA leave. *See Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) ("nothing in [the FMLA] places a duty on an employer to affirmatively grant leave without such a request or notice by the employee"); *Cf. Saenz v. Harlingen Med. Ctr., L.P.*, 613 F.3d 576, 583 (5th Cir. 2010) (after providing notice of need for FMLA leave, employee is "required to respond to reasonable employer inquiries for additional information").

Nor did Scott's communications with Work Partners convert her request for light duty into a request for FMLA leave. It is true that one of Work Partners' representatives initiated the process of assessing Scott's entitlement to FMLA leave, among other things. However, that fact has little bearing on whether UPMC should have known that Scott wanted leave, rather than light duty. Additionally, Work Partners offered to talk to Grandy on Scott's behalf, albeit after Scott had already failed both to report to her light duty assignment and to inform Grandy that she wanted leave instead of that assignment.

---

[3] On page 12 of her Reply Brief, Scott attempts to make a virtue out of this fact, stating that she "did not desire any more tha[n] she thought that she required." This argument misses the point: to apprise an employer that one needs leave, an employee must actually state as much.

[4] Scott did speak with Grandy's assistant about the July 15 instruction to return to work. However, when that assistant indicated that she did not know about the situation and could not help Scott, it was up to Scott to follow up with Grandy, particularly after his letter asking whether Scott intended to continue working for UPMC.

7

But Scott's decision to rely on Work Partners directly contravened the instruction contained in Grandy's July 24 letter, which stated "[p]lease contact me at 412-232-7226 no later than end of business on July 27, 2009 to advise me of your intentions of maintaining your active employment status with UPMC Mercy." This language was in boldface type and underlined, and Scott admits that she received the letter. Under these circumstances, she cannot create a dispute of fact out of her failure to comply with UPMC's reasonable request for information regarding whether she intended to return to work. [5]

\*  \*  \*

Accordingly, we affirm the District Court's grant of summary judgment to UPMC.

---

[5] Judge Barry would add that the District Court also properly concluded that the various disputes between Scott and UPMC concerning her "light duty" request were not disputes of material fact relevant to the substance of FMLA interference and retaliation claims. Rather, they reflected the fact that Scott's request for light duty, which UPMC-Mercy was prepared to accommodate on the shift for which she was hired, arose in the context of her unavailability for that shift because it conflicted with her job at PNC Park – a job at which she continued to work during the time of her alleged incapacitation, and that apparently involved duties that were as, if not more, strenuous than those that her UPMC job entailed.