PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2437
_____

RONALD ROSS,
                                    Appellant

v.

KEVIN GILHULY; CONTINENTAL
TIRE OF AMERICAS, LLC
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cv-02631)
District Judge:  Honorable Juan R. Sanchez
_____

Argued on April 9, 2014

Before:   AMBRO, JORDAN and ROTH, *Circuit Judges*.

(Filed: June 17, 2014)
_____

Wayne A. Ely, Esq.
Timothy M. Kolman, Esq.
W. Charles Sipio, Esq.   [ARGUED]
Kolman Ely
414 Hulmeville Avenue
Penndel, PA 19047
        Counsel for Appellant

Madeline S. Baio, Esq.   [ARGUED]
Divya Wallace, Esq.
Nicolson Law Group
1400 North Providence Rd.
Rose Treet Corporate Center II, Suite 4045
Media, PA 19063
        Counsel for Appellees

_____

OPINION
_____


JORDAN, *Circuit Judge*.


Ronald Ross appeals a grant of summary judgment by the United States District Court for the Eastern District of Pennsylvania to Continental Tire of Americas LLC ("Continental") and Kevin Gilhuly in this Family and Medical Leave Act ("FMLA") action.  29 U.S.C. §2601 *et seq*.  Because Ross received all to which he was entitled under the FMLA, and suffered no adverse employment consequences for doing so, we will affirm.

## I.    BACKGROUND[1]

Ross joined Continental, a tire manufacturing company headquartered in Fort Mill, South Carolina, as a Car Dealer Business Development Manager in February 2008.  In 2010, he became an Area Dealer Manager ("ADM") and then, in February 2011, an Area District Manager-3 ("ADM3").[2]  As an ADM3, Ross began reporting directly to Kevin Gilhuly, a Regional Manager.  Given the new responsibilities of his job and the fact that much of his work would put him on the road, Ross began working out of his home in Philadelphia, independently setting his travel schedule and work priorities. Ross's contact with Gilhuly consisted of biweekly regional sales conference calls, during which Gilhuly would review Ross's schedule and recommend changes as needed, and regular email and phone contact, with "a minimum of two to three [interactions] a week."  (App. at 172 (Ross Dep.).)  Ross concedes that, during the entire time of his employment with Continental, he had no contract of employment and remained an "at will" employee.  (*Id*. at 164.)

During his tenure at Continental, Ross had questions regarding "program specifics in terms of qualification requirements for the customer," "[program] calculations, [and] the relationships that [he] was developing, attempting to develop, with the customers to help them achieve their sales figures."  (*Id*. at 171.)  He sought Gilhuly's "assistance

---

[1] In accordance with our standard of review, *see infra* note 9, we set forth the facts in the light most favorable to Ross, the non-moving party.

[2] Ross's various job titles are as listed in his brief.

3

related to strategies, support, open discussion [sic], about how to achieve those on a regular basis," and he testified that Gilhuly was generally available to him. (*Id*.)

One of the customers for whom Ross was responsible was Reliable Tire Company ("Reliable Tire"). Ross testified that the Reliable Tire account "required a lot of interaction" with Reliable Tire's owner, Richard Betz, and was a rather "large account." (*Id*. at 185.) In fact, Reliable Tire provided Continental with millions of dollars in revenue in 2011 and 2012.

Shortly after Ross took over as ADM in 2010, Gilhuly began receiving negative comments from Betz regarding Ross's performance. While it is unclear from the record exactly when Betz shared his views about Ross, Gilhuly testified that Betz "specifically asked" that Ross be removed from the Reliable Tire account (App. at 331 (Gilhuly Dep.)), since, according to Betz, Ross "wasn't providing any value to him and … was actually a detriment to his business" (*id.* at 350). Betz later testified that he would characterize his statements regarding Ross as "comment[s]," not "complaint[s]," but he confirmed that he told Gilhuly that Ross "doesn't understand [the] business." (App. at 372 (Betz Dep.).) Betz also testified that he was "upset" with Ross because Ross had sent one of Betz's customers to another tire distributor. Betz further acknowledged that he asked that Ross be taken off of Reliable Tire's account.

According to Gilhuly, his concerns about Ross were confirmed when he "witness[ed Ross's] presentations at some of the regional meetings that [Continental] had as a sales team." (App. at 332 (Gilhuly Dep.).) For example, after

4

Ross gave a regional presentation in February or March of 2011, Gilhuly spoke with him regarding some of the data that Ross had presented and his presentation skills. Gilhuly also was not impressed with Ross's performance at a meeting to which Gilhuly accompanied Ross in June 2011 at Reliable Tire.

Sometime during the summer of 2011, Gilhuly began reporting Ross's performance deficiencies to Gabrielle Alexander, who worked in Continental's Human Resources Department ("HR"). As a part of a formal meeting in August 2011 at which Gilhuly reviewed all of his team members' performance levels and potential, Gilhuly told Alexander that Ross was "not meeting expectations." (App. at 446 (Performance Chart).) In addition, Gilhuly testified that they discussed Ross's ongoing problems working with Betz and his poor performance at both the February/March regional presentation and the June Reliable Tire meeting.

Later, between September 6, 2011, and October 11, 2011, Gilhuly corresponded with Alexander and Amanda Powell, another HR team member, regarding the development of a Performance Improvement Plan ("PIP") for Ross, which Gilhuly began drafting.[3]

---

[3] Pursuant to Continental's Performance Management Policy, Section V.D.:

> Persistent unsatisfactory performance as evidenced by a "does not meet expectations" performance rating is to be documented and a Performance Improvement Plan (PIP) prepared by the manager and reviewed with the Human

On September 21, 2011, Gilhuly told Ross "that a PIP was in process." (App. at 461 (Email Within Continental).) On the evening of October 11, 2011, when both Gilhuly and Ross were visiting Continental's headquarters as a part of a national sales meeting, Gilhuly took Ross aside and informed him that they would be meeting with HR the next day to review a PIP. Gilhuly suggested that the two of them meet in the hotel lobby in the morning, prior to going to the corporate office, to discuss the PIP and allow Gilhuly to formally provide Ross with his annual review.

That same evening, Ross prepared a memorandum outlining a six-month plan of action that acknowledged his deficiencies and listed ways he could improve his performance. In the first paragraph, Ross thanked Gilhuly for the opportunity to discuss his progress and stated that he was

---

Resource Manager for that department prior to facilitation to the employee. The PIP will clarify for the employee the actions he/she will need to take to bring performance to satisfactory levels. When satisfactory performance is reached, another performance review or written notice indicating other than "unsatisfactory" performance should be completed. ... An employee whose performance continues to appear to be "unsatisfactory" should normally be removed from the position. The evaluation period may be extended with the approval of the manager and Human Resources.

(App. at 465 (Performance Management Policy ).)

6

"very confident" that he could meet or exceed "the expectations in the areas [he and Gilhuly had] verbally discussed in the last 90 days." (App. at 473 (Ross Memo).)

At Ross's annual review the next morning, Gilhuly specified areas for improvement, including program understanding, analytical skills, call preparation, frequency of meetings with key customers, financial analysis, communication skills during sales calls, and better preparation, all of which were documented on an "Employee Dialogue Form." On that Form, Ross was rated for vision, entrepreneurship, execution, drive, learning, and interaction. On a scale of 1 to 5 – with 1 being "Minimum Standard not Achieved," 2 being "Developmental Needs," and 5 being "Extraordinary Strengths" – Ross was rated a 1 or 2 nineteen times out of a total of thirty-two areas. (App. at 482 (Employee Dialogue Form).) His overall performance evaluation was "does not meet expectations." (*Id.* at 483.)

After Gilhuly reviewed his concerns with Ross, the two met with Powell in Continental's corporate offices to review the PIP. The PIP included a memorandum from Gilhuly, entitled "ADM3 Performance," summarizing areas of deficiency and setting forth specific guidelines to address the identified problems. The memorandum and Continental's Performance Management Policy reflect that Ross's performance under the PIP was supposed to be evaluated after 90 days, with the possibility of additional evaluations. In fact, the memorandum included with the PIP specified that "[f]ailure to meet each one of these guidelines on an ongoing basis will result in further disciplinary action up to and including termination." (App. at 193 (Ross Dep.).) While the memorandum did say that Ross's "progress against these

7

expectations" would be "discuss[ed]" every "30 days for 90 days from the day of issuance," it did not say that the PIP would include any written or in-person performance evaluations. (*Id.*) Nor did it specify an end-date, noting that Continental would review Ross's job performance 90 days from the PIP's issuance and then decide "what additional actions, if any, will be necessary." (*Id.*)

On November 6, 2011, less than a month after the PIP was implemented, Ross forwarded to Gilhuly and Powell a letter from his physician to inform them that he had been diagnosed with prostate cancer and that further testing and a treatment plan would be forthcoming. Gilhuly promptly sent an email to Ross saying, "My thoughts and prayers are with you in what must be a very difficult time for you and your family. Take whatever time you need this week for the testing to determine the severity of the diagnosis." (App. at 489 (Email Within Continental).) Despite his illness, however, Ross wanted to move forward with his PIP. In late November, he and Gilhuly exchanged emails regarding Ross's request for "direct feedback verbal or written [sic] regarding [Gilhuly's] view" of Ross's progress and whether Ross was "on track." (*Id.* at 492.) In response, Gilhuly asked Ross to schedule a meeting with a customer so that Gilhuly could attend and provide feedback.

On December 5, Alexander sent an email to Ross, Gilhuly, Powell, Chris Charity (Gilhuly's superior), and James Sicking (Charity's superior) confirming that "the company would do everything we can to support [Ross] during this time." (*Id.* at 501.) Alexander further stated that, "based on [Ross's] health and treatment plan[,] the PIP timetable may need to be adjusted." (*Id.*) Gilhuly answered

8

with an email only to Alexander, Powell, Charity and Sicking, explaining that he thought Ross had "definitely made progress on most of the areas identified in the PIP," but that "there is still work to be done." (*Id.*) Specifically, Gilhuly made clear that the extension of the PIP would "give [Ross] more time to deal with the health issues." (*Id.*) Sicking also testified that Continental put the PIP on "hold" in order to give Ross time to "take care of [his] health," but that the intention was to "resume" the PIP once Ross returned. (App. at 293 (Sicking Dep.).)

Later in December, after receiving a formal notification of Ross's treatment plans, Gilhuly sent an email to Sicking and Charity, notifying them that Ross would require surgery and asking whether "we should consider pushing the PIP timetable by at least 30 days."[4] (App. at 503 (Email Within Continental).) Gilhuly then forwarded that email to Alexander, who agreed that the PIP timetable should be extended. Rather than "end" on January 10th – eight days before Ross's surgery date – the PIP was thus extended to February 10, 2012.

Ross, however, did not want the PIP to "hang[] over his head" during his recovery. (*Id*. at 502.) He emailed Gilhuly on December 23, 2011, asking that the PIP be completed by January 12, 2011. According to Ross, no action was taken in response to that request. Ross admitted at his deposition that, "[i]n order to successfully complete [the] PIP,

---

[4] Ross told Gilhuly by email on December 22, 2011, that his prostate surgery was scheduled for January 18, 2012, and that he would need to take 4 to 6 weeks of leave for recovery.

as per the policy, ... management would need to determine that [Ross's] performance was meeting their expectations in all areas identified in the PIP." (App. at 208 (Ross Dep.).)

It is undisputed that Ross requested and was granted FMLA leave that began on the date of his surgery, January 18, 2012, and ended when he returned to work on March 19, 2012. It is also undisputed that he continued to receive his regular compensation and insurance benefits while on leave. During the time that Ross was on leave, his PIP remained, as Ross testified, "pending."[5] (*Id*. at 209.) Ross also testified that when he finally returned to work on March 19, 2012, the status of his PIP was yet "to be determined" but that he returned to the same job from which he left. (*Id*. at 211.)

On April 12, 2012, almost a month after Ross returned from leave, Gilhuly sent him a new memorandum, entitled "ADM3 Performance – Addendum to October 12, 2011

---

[5] Twice while on leave, February 17 and February 23, Ross emailed Gilhuly regarding his PIP status. On February 23, Gilhuly responded, saying that "[t]he PIP cannot be changed or addressed until you return to work full time." (App. at 500 (Email Within Continental).) Around that same time, Ross and Gilhuly spoke on the phone regarding Ross returning to work under a "limited-duty basis." (App. at 209 (Ross's Dep.).) Given that the majority of Ross's work involved driving and visiting customers, which Ross would be unable to do, Gilhuly recommended that Ross not return until he received medical approval to engage in full-time work.

PIAP" ("Addendum").[6]  (App. at 506.)  In it, Gilhuly stated that he "acknowledg[ed] that progress has been made in [Ross's] job performance since the October 12, 2011 PIAP," but he went on to say, "it is also expected that [Ross] can demonstrate that [he] fully understand[s] and can effectively communicate to customers all the new 2012 Programs" that were introduced while Ross was on leave.  (App. at 506.)  Gilhuly extended the PIP an additional 60 days from the date of the Addendum and instructed that he would then "conduct a complete review of [Ross's] job performance, including the new requirements laid out in this addendum[,] and determine what additional actions, if any, are necessary."  (*Id.*)

On May 14, 2012, Ross filed this lawsuit against Gilhuly and Continental, alleging interference with his FMLA rights and also alleging retaliation.  On July 19, 2012, while this action was pending, Gilhuly sent Ross a third memorandum, entitled "ADM 3 Performance – October 12, 2011 PIAP and April 12th PIAP Addendum" (the "Final Memorandum") that summarized Ross's performance since the initiation of the PIP.  (*Id.* at 508.)  The thrust of the Final Memorandum was that Ross was still not meeting Continental's expectations for his position.  Citing various examples – including email chains between Ross and Gilhuly and anecdotes of Ross's work – Gilhuly explained over twelve pages that Ross was not "a 'good fit' for a sales role, particularly one requiring the business acumen to understand and effectively communicate [a] complex program."  (*Id.* at 519.)  That same day, Continental terminated Ross's employment in a teleconference with his attorney.  The

---

[6] "PIAP" stands for Performance Improvement Action Plan and is synonymous, in the parties' usage, with "PIP."

11

decision to terminate Ross was made by Sicking, Gilhuly, and Alexander, along with more senior members of Continental. Following his firing, Ross amended his complaint to add a wrongful-discharge claim.

On October 17, 2012, the District Court dismissed Ross's wrongful-discharge claim.[7] The remaining claims were an FMLA interference claim against Gilhuly and FMLA retaliation claims against both Gilhuly and Continental.[8] On summary judgment, the Court resolved those claims in favor of Gilhuly and Continental.

Ross timely appealed.

---

[7] Ross does not appeal the dismissal of that claim.

[8] At Argument, Ross's counsel asserted that the interference claim is against both Gilhuly and Continental (Oral Arg. Tr. at 4:20-21), but no fair reading of the Complaint can support that assertion. Not only does the Complaint list Gilhuly as the target of the interference claim, but Ross's Brief makes clear that that targeting was intended. (Appellant's Br. at 5 ("Appellant established a *prima facie* case for FMLA interference against his supervisor in the court below[ and] a causal link that could have led a reasonable fact finder to conclude that he was retaliated against for taking FMLA leave by Continental and his supervisor.").) We thus reject the effort to amend the Complaint on appeal.

## II. DISCUSSION[9]

The only issue before us on appeal is whether the District Court erred in granting summary judgment against Ross on his FMLA claims. The FMLA provides, in relevant part, that eligible employees are entitled to 12 workweeks of leave during any 12-month period due to an employee's own serious health condition. 29 U.S.C. § 2612(a)(1). When an employee returns from FMLA leave, the employer must restore the employee to the same or equivalent position he held, with equivalent benefits and with conditions of employment comparable to those he had when he left. *Id.* § 2614(a).

In *Lichtenstein v. University of Pittsburgh Medical Center*, we stated that,

---

[9] The District Court had jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and "view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010). "Summary judgment is appropriate where the [c]ourt is satisfied 'that there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[w]hen employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."

691 F.3d 294, 301 (3d Cir. 2012) (internal citations omitted). We have also held that "an individual supervisor working for an employer may be liable as an employer under the FMLA." *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 415 (3d Cir. 2012).

Ross argues that there are genuine issues of material fact that bar the District Court's grant of summary judgment. He says that his rights were violated by Gilhuly failing to conclude the initial PIP by January 2012, before he was expected to start his FMLA leave, and then by Gilhuly adding the PIP Addendum upon his return to work. He argues that he established a prima facie case of interference by Gilhuly and that there exists a causal link that could have led a reasonable factfinder to conclude that he was retaliated against for taking FMLA leave.

### A. *Interference*

To make a claim of interference under the FMLA, a plaintiff must establish:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008); *see also Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006) (noting that an interference claim requires an employee to show that he was not only entitled to FMLA benefits but that he was denied those benefits). Under an interference claim, "the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Sommer*, 461 F.3d at 399 (3d Cir. 2006) (alteration in original) (internal quotation marks omitted). Also, "[b]ecause the FMLA [interference claim] is not about discrimination, a *McDonnell-Douglas* burden-shifting analysis is not required." *Id.*

As noted previously, Ross brought his interference claim only against Gilhuly. On appeal, there is no dispute that Ross met the first, third, and fourth prongs for an interference claim, namely that he was an eligible employee under FMLA, that he was entitled to FLMA leave, and that he gave notice of his intention to take FMLA leave. The parties only dispute whether Gilhuly was liable as an "employer" under the FMLA (the third prong) and whether Ross showed that he had been denied benefits to which he was entitled under FMLA (the fifth prong). Because Ross received all of

15

the benefits to which he was entitled by taking leave and then being reinstated to the same position from which he left, and thus cannot satisfy the fifth prong of the interference analysis, he fails to make a prima facie showing of interference, and we need not address whether Gilhuly was an "employer" under the FMLA.

Although Ross argues that his termination and the Addendum to his PIP – actions which were taken after his FMLA leave – amount to a denial of FMLA benefits, [10] we have made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld. *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005) ("In order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them."). Ross's argument that Gilhuly interfered with his entitlement to take FMLA leave free from later discrimination confuses interference with retaliation and is thus misdirected. At bottom, "[a]n interference action is not about discrimination[;] it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison*, 430 F.3d at 120. Therefore, because Ross does not allege that Gilhuly withheld any entitlement guaranteed by FMLA, he fails to state a claim for interference.[11]

---

[10] Ross does not argue that he was denied reinstatement into the position that he left.

[11] In an April 17, 2014, letter filed pursuant to Rule 28j of the Federal Rules of Appellate Procedure, Ross recasts his interference claim to assert that he had somehow been

16

*B.* *Retaliation*

To succeed on an FMLA retaliation claim, a plaintiff must show that "(1) []he invoked h[is] right to FMLA-qualifying leave, (2) []he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." *Lichtenstein*, 691 F.3d at 302.

Gilhuly and Continental concede for the purposes of this appeal that Ross satisfies the first two elements of an FMLA retaliation claim, but they dispute whether Ross submitted sufficient evidence to raise a genuine dispute of material fact as to whether the Addendum and his termination were causally related to the invocation of his FMLA rights. Although Ross argues that "it is still somewhat unclear whether [this Court] has definitely adopted" the *McDonnell Douglas* framework for an FMLA claim (Appellant's Br. at 25), there should not be any such confusion. With respect to

discouraged from taking FMLA leave. In addition to Ross having waived that argument by failing to advance it in briefing, *see Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.13 (3d Cir. 2013) ("We have consistently held that '[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue ... will not suffice to bring that issue before this court.'"), the argument has no basis in fact. There is simply no evidence that Ross was discouraged from taking FMLA leave; on the contrary, Continental and Gilhuly fully supported Ross's need for leave and Ross took more than eight weeks of FMLA leave, without any interference or discouragement from Continental or Gilhuly.

17

retaliation claims based on circumstantial evidence, we have stated:

> Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–77 (1989) (O'Connor, J., concurring).

*Lichtenstein*, 691 F.3d at 302. While we decided to "leave for another day our resolution of whether the FMLA continues to allow mixed-motive claims in the wake of *Gross* [*v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)]," *id.*, Ross does not argue that his retaliation claims are mixed-motive claims.[12] The only question, therefore, is whether Ross is able to meet the shifting burdens of *McDonnell Douglas*.

---

[12] In *Gross*, the Supreme Court held that a mixed-motive jury instruction is "never proper in an [Age Discrimination in Employment Act of 1967] claim." 557 U.S. at 170. Since the plaintiff in *Lichtenstein* "readily survive[d] summary judgment under the more taxing *McDonnell Douglas* standard," we did not find it necessary to address whether a mixed-motive framework was appropriate to apply to an FMLA retaliation claim. 691 F.3d at 302.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). If the plaintiff succeeds, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination. *Id.* Even assuming, *arguendo*, that Ross established a prima facie case, Continental and Gilhuly have submitted a legitimate, non-discriminatory reason for Ross's termination – his demonstrably poor job performance – and Ross has not adduced any meaningful evidence to allow a reasonable factfinder to find pretext.

In urging that he has shown pretext, Ross makes two primary arguments. First, he contends that the sole motivating factor for the PIP was Betz's desire that Ross be removed from the Reliable Tire account and not Ross's overall poor performance. In other words, at least according to Ross, there was no assertion that he was failing to meet the primary objectives of his position. But, even if Ross's version of events were accurate, his argument misses the point. Assuming that the PIP was originally justified only on the basis of Betz's concerns does not help Ross because customer feedback, particularly from an important customer who accounts for millions of dollars of revenue, is an obviously valid factor in evaluating performance.[13] Ross's

[13] Moreover, a "plaintiff cannot simply show that the employer's decision was wrong or mistaken" to prove pretext; rather, the "plaintiff must demonstrate such

argument is also flawed because its factual premise is belied by the record. Betz's concerns were not the sole justification provided for implementing the PIP or the later Addendum, and they were not the sole reason Ross was ultimately terminated. He had admitted to his sub-par performance in the memorandum he prepared for Gilhuly the evening before the PIP was introduced, and his other numerous failures were documented in detail and at length in Gilhuly's Final Memorandum.

Second, Ross contends that pretext is apparent because of the temporal proximity between his asking for FMLA leave and Continental's decision to extend the PIP. He asserts that because Continental managers did not begin to discuss extending the PIP until after being informed of his illness and his intent to take leave, any justification Continental now puts forward is pretextual. Under our precedent, however, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Phila.*

---

'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.'" *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (alteration in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). Here, there is no evidence of such weaknesses in the explanations proffered by Continental and Gilhuly.

20

*Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (internal quotation marks omitted). Here, there is nothing unusually suggestive about the timing of the Addendum or Ross's termination. Rather, it was perfectly sensible for Continental to delay the timeline of the PIP to accommodate Ross's FMLA leave. The fact that Ross was placed on the original PIP based on documented performance problems well before his employer knew he was sick defeats any retaliatory inference based on timing.

Again, the reasons for Ross's termination, as detailed in the Final Memorandum, were deficiencies that had existed since before he took his FMLA leave. An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity. *See Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d. Cir. 2000) ("In short, the record shows that Shaner's performance evaluations contained similar criticisms both before and after he made the company aware that he suffered from MS and before and after he filed his first EEOC charge. Under these circumstances, there is simply no evidence that any of these evaluations was causally linked to the filing of Shaner's first EEOC charge or that any of them was motivated by discriminatory or retaliatory intent."). Ross has failed to establish a causal link here, and there was no error in granting summary judgment.

## III.   CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.