**Matthew GRAVEL, Plaintiff,**

v.

**COSTCO WHOLESALE CORP., Defendant.**

Civ. No. 16–1463

United States District Court, E.D. Pennsylvania.

Filed January 31, 2017

---

**72.** *Rhines v. Weber,* 544 U.S. 269, 275–76, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005).

**73.** *Id.* at 277, 125 S.Ct. 1528.

**74.** *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal citation omitted).

Christine E. Burke, Ari Risson Karpf, Karpf, Karpf & Cerutti, P.C., Bensalem, PA, for Plaintiff.

Courtney S. Stieber, Ephraim J. Pierre, Jacob Oslick, Seyfarth Shaw LLP, New York, NY, Eric J. Janson, Seyfarth Shaw LLP, Washington, DC, Lynn A. Kappelman, Seyfarth Shaw LLP, Boston, MA, for Defendant.

## ORDER

Paul S. Diamond, District Judge.

Plaintiff Matthew Gravel alleges that his former employer, Defendant Costco, violated the Family Medical Leave Act's anti-retaliation and anti-interference provisions. (See Compl., Doc. No. 1.) Defendant has moved for summary judgment, and the Parties have extensively briefed the matter. (See Doc. Nos. 19, 24, 29, 42, 43.) The undisputed facts show that Plaintiff explicitly stated his desire *not* to take FMLA leave, and that he never invoked FMLA rights as required to sustain his claims. Alternatively, Plaintiff has failed to demonstrate pretext to overcome Defendant's legitimate basis for taking adverse actions against Plaintiff. Accordingly, I will grant summary judgment in favor of Defendant.

## I. BACKGROUND

I have resolved all material factual disputes in Plaintiff's favor and considered the evidence in the light most favorable to him.

Defendant employed Plaintiff as a payroll clerk in its Concordville facility. (Gravel Dep. 68:20–69:4.) Payroll clerks used Workforce, Defendant's intranet payroll system, to set and adjust employee work schedules and timecards. (Id. at 100:14–102:24; Gerig Dep. 18:22–22:16.) The payroll clerk must enter his username—typically the user's employee ID number—and a unique, self-created password to access

Workforce. (Gravel Dep. 112:23–113:16.) Workforce blocks a user's ability to alter his own schedules and timecards. (Id. at 109:18–110:16; Randolph Decl. ¶ 17; Sturgill Dep. 18:23–19:2.) Accordingly, a user must have a manager approve any change and enter it into Workforce. (Gravel Dep. 109:18–110:16; Randolph Decl. ¶ 17.) Plaintiff understood that this process created a "checks and balances" system to eliminate "potential fabrications" of employee time. (Gravel Dep. 110:24–111:14.) Moreover, Plaintiff processed employee requests for FMLA–designated leave, tracked the amount of FMLA leave used by employees, and served as the "point person" for information respecting FMLA procedures and practices. (Id. at 82:15–83:10, 99:1–8.)

In February 2015, Plaintiff initiated the process of fostering Gabriel, a six-year-old child. (Id. at 201:18–21.) Because Gabriel suffered from PTSD, Plaintiff had to participate in Gabriel's psychological treatment sessions before the child was placed in his home on April 15, 2015. (Pl.'s Resp. at 6–7; Gravel Dep. 225:7–14; Tifone Dep. 26:15–27:17; Caprara Cert. ¶¶ 6, 8.)

Defendant knew that Plaintiff was fostering a child. (See, e.g., Randolph Dep. 28:19–29:1; Gerig Dep. 72:18–74:18.) Assistant General Manager Jim Burr asked Plaintiff if he planned to take bonding leave. (Pl.'s Supp. Br. at 3; Gravel Dep. 205:1–25; Randolph Dep. 28:19–29:1; Gerig Dep. 72:18–73:18.) Plaintiff replied that if management was "flexible with [his] schedule," he could "stay." (Gravel Dep. 207:16–25.) This conversation prompted Plaintiff to consult with management about reconciling his work schedule with the demands of Gabriel's care. (Id. at 171:4–24, 205:1–21, 212:18–23.) Plaintiff proposed a mutually agreeable, flexible schedule in lieu of taking FMLA–designated leave. (Id. at 204:12–208:15, 209:2–16, 211:16–212:2, 215:8–216:7, 228:2–18; Letter from Gravel

to Jelinek, Ex. 24, Doc. No. 20. But see Pl.'s Supp. Br. at 4 ("Thereafter, [Plaintiff] assumed that [management] would honor the agreement *they* proposed: i.e. just giving him flexibility in his schedule to work and still bond with Gabriel." (emphasis in original)).) Management agreed, telling Plaintiff "you're very valuable, we can't lose you, [and] we need you to stay." (Gravel Dep. 171:14–24.) Management never asked or instructed Plaintiff not to apply for FMLA leave. (Id. at 227:10–228:1.) Plaintiff later explained that he believed that taking bonding leave would be unnecessary because management would give him the flexible schedule he needed. (Id. at 205:12–21.)

The Parties then "proceeded with the proposed flexibly [sic] in [Plaintiff's] schedule for Gabriel." (Pl.'s Supp. Br. at 4.) Defendant adjusted Plaintiff's schedule to accommodate weekly meetings with Gabriel's therapist and at least one family court proceeding, and permitted him to leave his scheduled shift to pick up Gabriel from school when he was sick. (Id.; Gravel Dep. 213:12–214:14, 228:2–23; Curnoles Dep. 23:13–24:13.) Plaintiff concedes that Defendant never denied him permission to leave work or otherwise adjust his schedule to care for Gabriel. (Gravel Dep. 151:11–20, 172:25–173:7, 204:8–11, 228:2–23, 244:18–245:2.)

Plaintiff's employment difficulties began very shortly after Defendant learned that Plaintiff had falsified his time records in Workforce innumerable times. On April 27, 2015, Plaintiff left work at 1:34 p.m. to go shopping, but the next day he logged in to Workforce using Administrative Manager Jeane Curnoles's username and password and adjusted his time out from "1:34 p.m." to "2:22 p.m." (Id. at 118:12–119:1, 120:1–9.) At the time, Curnoles was on a leave of absence. (Curnoles Dep. 5:10–13.) Although Plaintiff knew that adjusting his

own schedule and timecard violated Defendant's policy, Plaintiff testified that he nonetheless believed he could properly use Curnoles' Workforce credentials because she had given him permission to do so on each of several prior occasions. (Gravel Dep. 110:24–111:14, 122:4–17, 124:8–14, 127:15–21; Unempl. Hr'g Tr. at 27, Ex. 10, Doc No. 20.)

On April 30, 2015, Assistant General Manager Tammy Sturgill reported Plaintiff's conduct to General Manager Randy Randolph. (Sturgill Dep. 32:1–18, 40:9–17; 4/30/16 Email from Sturgill to Randolph, Ex. 15, Doc. No. 20.) On May 5, 2015, Sturgill and Randolph informed Plaintiff that they were investigating him for falsifying timecard entries. (Gravel Dep. 114:16–116:8, 122:22–123:9.) Immediately after this meeting, Plaintiff for the first time began executing FMLA paperwork. (Id. at 163:1–8.) Plaintiff testified that he was "pretty certain" Randolph saw him filling out the paperwork because of "the way his eyes looked and he looked at me." (Id. at 163:9–164:20, 240:1–241:22.) On May 9, 2015, Plaintiff received a three-day suspension pending possible termination while management continued to investigate. (Id. at 153:6–154:12, 155:1–13; Notice of Suspension, Ex. CC, Doc. No. 24.)

The investigation revealed that between March 2, 2015 and May 11, 2015—the seventy days during which Curnoles was on leave—Plaintiff made 105 timecard adjustments and 52 schedule adjustments using Curnoles' username and password. (Gravel Dep. 139:16–140:2, 176:11–179:15, 180:4–14; Gravel Statement, Ex. 12, Doc. No. 20; 5/11/15 Email from Randolph to Fontana, Ex. 20, id.; Randolph Decl. ¶ 20.) When asked, Curnoles denied giving Plaintiff permission to use her Workforce account while on leave. (Unempl. Hr'g Tr. at 45–46.)

Although Plaintiff's "adjustments" are too numerous to review in detail, the following are typical. On April 28, 2015, Plaintiff arrived an hour and twenty-five minutes late to his scheduled shift; that afternoon, he altered his schedule so that it appeared he had arrived to his "scheduled" shift five minutes early. (5/11/15 Email from Randolph to Fontana.) On April 29, 2015, Plaintiff arrived forty minutes late to his shift, but altered his schedule to seem as though he arrived five minutes early. (Id.) On April 30, 2015, Plaintiff arrived two hours and ten minutes late to his shift, but altered his schedule to appear as though he arrived five minutes early. (Id.) Plaintiff cannot identify which, if any, of his 157 adjustments were related to Gabriel's care. (Gravel Dep. 229:18–230:9.)

On May 11, 2015, after completing its investigation, management decided to fire Plaintiff. (5/11/15 Email from Fontana to Randolph.) On May 19, 2015, Defendant terminated Plaintiff's employment via telephone. (Gravel Dep. 166:4–167:7; Notice of Termination, Ex. G, Doc. No. 21.) The same day, Plaintiff submitted FMLA paperwork requesting continuous leave beginning May 18, 2015. (See FMLA Paperwork, Ex. 23, Doc. No. 20.)

On June 26, 2015, Plaintiff authored and mailed a letter to Defendant's CEO "to correct [his] wrongful termination." (Letter from Gravel to Jelinek.) Describing the circumstances surrounding his termination, Plaintiff wrote:

> I'd also been in the middle of an adoption process. I was asked several times if I was going to take bonding leave when the child was placed. Given the fact that no one in the warehouse is qualified to do my job, and management never fully trained a backup payroll clerk, *I let them know that I would not use bonding leave, but would need a lot of flexibility in my schedule* to make sure I was there for my new child and also fulfill

the needs of the job. This again was me taking ownership for the position and trying to do what was best for Costco, since management did not follow through on training a backup payroll clerk. Some of this *requested flexibility* necessitated occasionally changing my work schedule.

(Id. (emphasis added).)

## II. LEGAL STANDARDS

### A. Summary Judgment

Upon motion of any party, "summary judgment is appropriate where the moving party has established that there is no genuine dispute of material fact and 'the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A fact is material if it could affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements" of his claims. Hugh, 418 F.3d at 267 (citing Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548).

I must "view the facts in the light most favorable to the non-moving party" and "make all reasonable inferences in that party's favor." Id. To survive a motion for summary judgment, the non-moving party cannot rest upon allegations in the pleadings, but instead "must set forth specific facts that a reasonable jury could find in the non-moving party's favor, thereby establishing a genuine issue of fact for trial." Id. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989).

### B. Family Medical Leave Act

The FMLA allows employees to take reasonable unpaid leave for adopting or fostering a child. 29 C.F.R. § 825.101(a). A foster parent–employee may take this leave before placement of the child if an absence from work is required for the foster care to proceed. Id. § 825.121(a)(1). "For example, the employee may be required to attend counseling sessions, appear in court," and the like to facilitate placement. Id.

After the placement of a healthy child, the employee "may use intermittent or reduced schedule leave ... only if the employer agrees." Id. § 825.121(b). "[F]or example, the employer and employee may agree to a part-time work schedule after the placement for bonding purposes." Id. The employer's consent is not required, however, for intermittent leave required to "care for" a foster child with a "serious health condition." Id.; see also id. § 825.113(a) (defining "serious health condition"); Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 300 (3d Cir. 2012) (discussing "care for" as defined by 29 C.F.R. § 825.124(a)).

#### i. *Adequacy of Notice*

██ "Even when these qualifying circumstances exist, employees cannot invoke rights under the FMLA if they fail to provide adequate notice." Lichtenstein, 691 F.3d at 301 (citing 29 U.S.C. § 2612(e)). An employee's notice obligation plays a "crucial role ... in surviving a motion for summary judgment." De Luca v. Trs. of Univ. of Pa., 834 F.Supp.2d 282, 293 (E.D. Pa. 2011) (granting summary judgment on FMLA interference claim because Plaintiff did not provide requisite notice). The requisite timing of the notice turns on whether the need for leave is foreseeable. See 29

C.F.R. § 825.302. Fostering a child is a foreseeable need for leave. Id. § 825.302(a). Cf. Lichtenstein, 691 F.3d at 301 n.9 (unforeseeable need for leave often arises in the context of a medical emergency). Accordingly, a foster parent-employee must give his employer at least 30 days' notice before taking FMLA leave. 29 C.F.R. § 825.302(a).

 Adequate notice must communicate an employee's intent to take leave. See id. § 825.303(b). An employee need not refer to the FMLA by name to invoke such leave. Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007); see 29 C.F.R. § 825.303(b) (employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request"). Instead, an employer has the burden to determine "whether FMLA leave is being sought." 29 C.F.R. § 825.302(c). Significantly,

> [a]n employer's obligation to ascertain 'whether FMLA leave is being sought' strongly suggests there are circumstances in which an employee might seek time off but intend not to exercise his or her rights under the FMLA. And a compelling practical reason supports this conclusion. Holding that simply referencing an FMLA-qualifying reason triggers FMLA protections would place employers ... in an untenable situation if the employee's stated desire is *not* to take FMLA leave. The employer could find itself open to liability for forcing FMLA leave on the unwilling employee. See, e.g., Wysong v. Dow Chem. Co., 503 F.3d 441, 449 (6th Cir. 2007) (noting that "[a]n involuntary-leave claim," alleging that an "employer forces an employee to take FMLA leave," is "really a type of interference claim"). [A]n employee can affirmatively decline to use FMLA leave, even if the underlying reason for seeking the leave would have invoked

FMLA protection. See, e.g., Ridings v. Riverside Med. Ctr., 537 F.3d 755, 769 n.3 (7th Cir. 2008) ("If an employee *does not wish to take FMLA leave* but continues to be absent from work, then the employee must have a reason for the absence that is acceptable under the employer's policies, otherwise termination is justified." (emphasis added)).

Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236, 1244 (9th Cir. 2014) (emphasis in original); see also Amstutz v. Liberty Ctr. Bd. of Educ., 127 F.Supp.3d 846, 854 (N.D. Ohio 2015) (granting summary judgment in favor of defendant-employer because plaintiff-employee who declined to use FMLA cannot "retroactively invoke a right she previously chose not to exercise").

 "The critical question is how the information conveyed to the employer is reasonably interpreted." Sarnowski, 510 F.3d at 402. Although this is usually a question of fact, notice becomes a question of law where " 'no rational trier of fact could conclude' that the employee's notice was adequate." Lichtenstein, 691 F.3d at 303 n.14 (quoting Satterfield v. Wal–Mart Stores, Inc., 135 F.3d 973, 980–81 (5th Cir. 1998)); see, e.g., Scott v. UPMC, 435 Fed. Appx. 104, 106–08 (3d Cir. 2011) (affirming summary judgment granted for employer on basis of inadequate notice); Goss v. Standard Steel, LLC, No. 13–607, 2014 WL 6687314, at *6–11 (M.D. Pa. Nov. 26, 2014) (same); Grosso v. UPMC, 857 F.Supp.2d 517, 540–42 (W.D. Pa. 2012) (same); Rosenfeld v. Canon Bus. Solutions, Inc., No. 09–4127, 2011 WL 4527959, at *9 (D.N.J. Sept. 26, 2011) (same).

ii. *Interference and Retaliation Claims*

 An employer may not "interfere with, restrain, or deny [an employee's] exercise of or attempt to exercise" FMLA rights. 29 U.S.C. § 2615(a)(1). To prevail

on an interference claim, a plaintiff must demonstrate that: (1) he was entitled to benefits under the FMLA; (2) he gave notice to his employer of his intention to take FMLA leave; and (3) his employer improperly prevented him from obtaining those benefits. Ross v. Gilhuly, 755 F.3d 185, 191 (3d Cir. 2014). "For an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." Ross, 755 F.3d at 192. If FMLA benefits were not actually withheld, "summary judgment must be granted in favor of the defense" with respect to an interference claim. Moore v. U.S. Foodservice, Inc., No. 11–2460, 2013 WL 5476405, *8 (D.N.J. Sept. 30, 2013).

■■■■■ An employer may not retaliate against an employee who attempts to exercise FMLA rights. 29 U.S.C. § 2615(a)(2). To prevail on a retaliation claim, a plaintiff must first show that: (1) he invoked his right to FMLA benefits; (2) he suffered an adverse employment decision; and (3) the adverse decision was causally related to his invocation of FMLA rights. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). If the plaintiff makes out this prima facie case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse decision. Lichtenstein, 691 F.3d at 302. If the defendant satisfies that burden, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (internal citation omitted) (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

## III. DISCUSSION

### A. Adequacy of Notice

■■■■ Plaintiff alleges that Defendant "committed FMLA violations by suspending and terminating his employment 1) in retaliation for requesting and utilizing FMLA leave, 2) to dissuade him from taking FMLA leave, and/or 3) to prevent him from utilizing FMLA leave in the future." (Pl.'s Mem. at 1.) No matter how favorably construed, the record simply does not support these claims because Plaintiff never gave Defendant notice of his *intent to take FMLA–designated leave* and thus never triggered FMLA protections. See 29 U.S.C. § 2615(a)(1)–(2); Lichtenstein, 691 F.3d at 301–02, 312; Sarnowski, 510 F.3d at 403; Escriba, 743 F.3d at 1244.

The record shows that Plaintiff explicitly requested *not* to take FMLA–designated leave and instead asked if management would accommodate him with an informal, flexible scheduling arrangement. (Gravel Dep. 204:12–208:15, 209:2–16, 211:16–212:2, 215:2–216:7, 228:8–18; Letter from Gravel to Jelinek.). Before May 5, 2015—the date Plaintiff began filling out FMLA paperwork—Plaintiff expressed to Defendant his explicit desire *not* to use FMLA–designated bonding leave. (See Letter from Gravel to Jelinek ("I let them know that I would not use bonding leave, but would need a lot of flexibility in my schedule to make sure I was there for my new child and also fulfill the needs of the job.").) When asked in his deposition "who proposed the idea of a flexible schedule," Plaintiff testified: "I believe I did. Yeah, I had stated, if you guys are flexible with my schedule, then I'm happy to stay, and we can work around it to make sure that I'm able to do what needs to be done, I will stay." (Gravel Dep. 211:16–212:2.) Plaintiff offered a similar version of events in his letter to Defendant's CEO:

At the same time, I'd also been in the middle of an adoption process. I was asked several times if I was going to take bonding leave when the child was placed. Given the fact that no one in the warehouse is qualified to do my job, and management never fully trained a back-up payroll clerk, *I let them know that I would not use bonding leave, but would need a lot of flexibility in my schedule* to make sure I was there for my new child and also fulfill the needs of the job. This again was me taking ownership for the position and trying to do what was best for Costco, since management did not follow through on training a backup payroll clerk. Some of this *requested flexibility* necessitated occasionally changing my work schedule.

(Letter from Gravel to Jelinek.) As payroll clerk, Plaintiff was in charge of the facility's FMLA program and was thus intimately familiar with what constituted "FMLA leave" and the procedures for requesting it. (Gravel Dep. 82:15–83:10, 99:1–8.) Instead of requesting FMLA leave, Plaintiff "requested flexibility." (Letter from Gravel to Jelinek.) Plaintiff seeks to conjure a factual dispute by asserting in his counseled briefs that management explicitly told him not to apply for FMLA. (See Pl.'s Resp. at 7 (asserting that management told Plaintiff "that he did not need to apply for FMLA"); Pl.'s Supp. Br. at 4 ("Thereafter, [Plaintiff] assumed that [management] would honor the agreement *they* proposed: i.e. just giving him flexibility in his schedule to work and still bond with Gabriel." (emphasis in original)).). Because there is no evidence to support this allegation, it does not create a *genuine* factual dispute. See Wilson v. Cleveland Clinic Found., 579 Fed.Appx. 392, 404 (6th Cir. 2014) (Supreme Court repeatedly has endorsed looking to the record as a whole to determine if issue is "genuine"); Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) ("[D]is-

putes are 'genuine' if evidence exists which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.").

Plaintiff also contends that his execution or submission of FMLA paperwork on May 5, 2015 and May 19, 2015 provided valid notice to Defendant. This is absurd. Plaintiff admits that he did not begin filling out FMLA paperwork until he learned he was being investigated for falsifying his entries in Workforce. (Gravel Dep. 233:10–234:5.) By the time Plaintiff actually submitted his FMLA leave request, Defendant had suspended Plaintiff pending his termination. (Id. at 153:6–154:12, 155:1–13, 238:12–16; 5/11/15 Email from Fontana to Randolph.) Moreover, by that time, Gabriel had been placed in Plaintiff's home for over a month. (Pl.'s Resp. at 7; Gravel Dep. 201:18–21.) Plaintiff's May 2015 retrospective "notice" was thus plainly invalid. See 29 C.F.R. § 825.302(a) (30 days' notice required); Lichtenstein, 691 F.3d at 301; De Luca, 834 F.Supp.2d at 293.

**B. Interference and Retaliation Claims**

In the alternative, Plaintiff cannot establish additional essential elements of his FMLA claims. See Hugh, 418 F.3d at 267 (citing Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548). "For an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." Ross, 755 F.3d at 192. "[I]f Plaintiff was not denied FMLA leave to which he was entitled, summary judgment must be granted in favor of the defense on Plaintiff's claim of interference." Moore, 2013 WL 5476405, at *8. Plaintiff concedes that he was never denied permission to leave work, nor to adjust his schedule, to care for Gabriel. (Gravel Dep. 151:11–20, 172:25–173:7, 204:8–11, 228:2–23, 244:18–245:2.) Accordingly, summary judgment must be granted in favor of Defendant on

Plaintiff's interference claim. <u>Ross</u>, 755 F.3d at 192; <u>Moore</u>, 2013 WL 5476405, at *8.

 Moreover, Defendant has articulated "some legitimate, nondiscriminatory reason" for terminating Plaintiff: between March 2, 2015 and May 11, 2015, Plaintiff made 105 time-card adjustments and 52 schedule adjustments using Curnoles' Workforce log-in information without her permission. <u>See</u> <u>Lichtenstein</u>, 691 F.3d at 302; (Gravel Dep. 139:16–140:2, 176:11–179:15, 180:4–14; Gravel Statement; 5/11/15 Email from Randolph to Fontana; Randolph Decl. ¶ 20; Unempl. Hr'g Tr. at 45–46.)

Plaintiff has utterly failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's stated reason for terminating his employment such that a "reasonable factfinder could rationally find them 'unworthy of credence.'" <u>Fuentes</u>, 32 F.3d at 765 (quoting <u>Josey</u>, 996 F.2d at 638. Although I accept (for purposes of this Motion) that Curnoles had given Plaintiff permission to use her Workforce log-in on several prior occasions, there is no evidence that she told Plaintiff he could subsequently make almost 200 adjustments without her permission. Moreover, Plaintiff did not have *Defendant's* permission to make changes to his own timecard or schedule. Plaintiff knew that adjusting his own schedule and timecard violated Defendant's policy. (Gravel Dep. 110:24–111:14; Unempl. Hr'g Tr. at 27.) Plaintiff understood that this policy served to protect against fabrications of employee time. (Gravel Dep. 110:24–111:14.) Plaintiff made alterations in Workforce using Curnoles's log-in credentials to disguise his tardiness and to appear compliant with his work schedule. (5/11/15 Email from Randolph to Fontana.) Moreover, Plaintiff cannot identify which, if any, of his 157 adjustments were related to Gabriel's care. (Gravel

Dep. 229:18–230:9.) No reasonable factfinder could find that Plaintiff had permission to steal company time, conceal his tardiness, or make almost two hundred self-serving adjustments over seventy days such that Defendant's proffered reason for terminating Plaintiff is "unworthy of credence." <u>Josey</u>, 996 F.2d at 638. Accordingly, Plaintiff's FMLA claims again fail—this time because he has not made out pretext.

## IV. CONCLUSION

In sum, the record confirms that Plaintiff's FMLA rights were not violated because Plaintiff never invoked the FMLA. The record further shows that Defendant fired Plaintiff for fabricating innumerable time entries in violation of Defendant's well-known policy. For these reasons, I will grant Defendant's Motion for Summary Judgment.

**AND NOW**, this 31st day of January, 2017, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 19) and related submissions (Doc. Nos. 20–22), Plaintiff's Response (Doc. No. 24), Defendant's Reply (Doc. No. 29), and Plaintiff's Supplemental Briefing (Doc. No. 43), it is hereby **ORDERED** as follows:

1. Defendant's Motion (Doc. No. 19) is **GRANTED**.

2. Judgment shall be **ENTERED** in favor of Defendant Costco and against Plaintiff Matthew Gravel.

3. The Clerk of Court shall **CLOSE** this case.

**AND IT IS SO ORDERED.**