NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-1358

_____

UNITED STATES OF AMERICA ex rel. WILLIAM A. THOMAS,
                                                    Appellant

v.

SIEMENS AG, SIEMENS MEDICAL SOLUTIONS, INC.,
SIEMENS CORPORATION

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cv-04414)
District Judge:  Honorable Timothy J. Savage

_____

Submitted Under Third Circuit LAR 34.1(a)
November 18, 2014

Before:  RENDELL, JORDAN, NYGAARD, *Circuit Judges*.

(Filed: November 25, 2014)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

In this *qui tam* action, the relator, William A. Thomas, appeals the grant of summary judgment by the United States District Court for the Eastern District of Pennsylvania in favor of his former employer Siemens Medical Solutions USA, Inc. ("SMS"), a subsidiary of Siemens AG, for claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). He also appeals the District Court's denial of his fourth motion to amend the complaint.[1] For the reasons that follow, we will affirm.

## I.    Background

Thomas worked for SMS, a manufacturer and seller of capital medical equipment,[2] and before that for Acuson Corporation, a manufacturer and seller of one kind of such equipment, ultrasound systems. Siemens AG acquired Acuson in 2000 and merged it into SMS in 2002. Thomas worked in sales and marketing and as an account manager. Though his employers had business with the federal government, he never had any involvement with those contracts.

---

[1] In his notice of appeal, Thomas further states that he is appealing "the order entered April 26, 2010 (doc. 69) granting defendant Siemens AG's motion to dismiss the Second Amended Complaint." (Doc. No. 1.) He has not, however, provided any argument on that point and his appeal of it is therefore abandoned. *Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal.").

[2] Capital medical equipment includes ultrasound systems, computed-tomography (CT) scanners, magnetic resonance imaging (MRI) scanners, and nuclear medical equipment.

At issue here are three contracts between Acuson/SMS and the Department of Veterans Affairs (the "VA"): (1) a 2001 contract for ultrasound equipment; (2) a 2002 contract for CT/MRI equipment; and (3) a 2002 contract for nuclear medicine equipment. *United States ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 546-48 (E.D. Pa. 2014). Two of the contracts – the ultrasound contract and the CT/MRI contract – were fully audited by the VA Inspector General pursuant to a policy of conducting pre–award audits for any contract proposal with an expected value exceeding $9 million. *Id.*

A.    *The Ultrasound Contract*

The ultrasound contract was the result of extensive negotiations. Acuson responded to a VA solicitation for ultrasound equipment in 2000 with a bid that included, *inter alia*, a form setting forth required "Discount and Pricing Information."[3] Acuson offered the VA a 43% discount and disclosed that other entities were given discounts greater than those extended to the government – as high as 48%. The pre-award audit also confirmed that the discounts offered to commercial customers exceeded those offered to the government – specifically that Acuson had provided discounts of 59% and

_____

[3] The Discount and Pricing Information form is used as part of the award process to evaluate the vendors' pricing. The form asks vendors to specify the basis of the list pricing the vendor is offering the VA and the discount percentage offered for the capital medical equipment. The form also requests information on discounts given to other customers. It contains neither completion instructions, nor definitions of terms. For example, the form does not specify whether to disclose contract-level or transaction-level discounts. The undisputed evidence establishes that the VA accepted such forms completed in materially different ways, namely forms containing either transaction-level or contract-level discounts, and forms containing either comparable or noncomparable discounts. (App. at 1698) (former chief operating officer of the VA stated that the VA understood the "significant ambiguities, limitations, and differing interpretations of the [Discount and Pricing Information] form.").

56% on ultrasound products. Based on the audit, the VA asked Acuson to increase its discounts to 48% and 50% respectively for two different products. Acuson then resubmitted its Discount and Pricing Information to the VA and increased its discount offer to 48% with additional multiple-system discounts. The VA accepted the resubmitted information and awarded Acuson the contract.

### B.    The CT/MRI Contract

The VA solicited bids for CT/MRI equipment and SMS submitted a response in April 2002. SMS submitted separate Discount and Pricing Information forms for the CT and MRI equipment in which it – unlike Acuson – identified the discounts offered only to customers with contracts comparable to the VA contract. SMS thus disclosed maximum discounts of 32% for CT equipment and 35% for MRI equipment, stating that it offered further discounts if certain minimum orders were satisfied. SMS then went on to offer those same discounts to the VA. Before SMS submitted the Discount and Pricing Information forms, the VA notified it that SMS would be subject to an Inspector General audit. The audit revealed that SMS was offering larger discounts to commercial customers than it had offered to the VA.[4] Based on that information, the VA negotiated further upgrades to the equipment, but ultimately accepted the discounts of 32% and 35% respectively, even though it knew that SMS offered greater discounts to other customers.

---

[4] The District Court concluded that the pricing offered to commercial customers was distinguishable from that offered to the VA because those contracts were part of a group purchase and were structured differently than the government contracts or referred to items which were not offered as part of the CME needed by the VA. *Siemens AG*, 991 F. Supp. 2d at 585-88.

## C. The Nuclear Medicine Contract

In October 2002, SMS submitted a response to the VA's solicitation for nuclear medicine equipment. In the Discount and Pricing Information submitted with its response, SMS offered the VA a discount of 60% off of its list pricing and disclosed that it had multiple-quantity unit pricing plans that "result[ed] in lower net prices than those offered the [g]overnment in this offer." (App. at 2518.) SMS stated that it offered regular discounts of 52% to 56% and quantity discounts of 54% to 58%. The undisputed evidence establishes that the 60% discount SMS offered to the government was the highest discount it offered at that time, with one exception that the parties agree is not pertinent.[5] After several months of negotiation, the VA awarded the nuclear medicine contract to SMS.

## D. Procedural History[6]

Relying on Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, SMS moved to dismiss Thomas's claims. While that motion was pending, Thomas moved to

---

[5] As the District Court noted, Thomas, during his deposition, conceded that those exceptional discounts given to one company are distinguishable from the contracts at issue here. *Id.* at 586; (App. at 1521-23, 1191-92; Supp. App. at 79).

[6] Thomas filed this action in the District Court for the Virgin Islands in September 2004 – within a few months of beginning work at SMS. The initial complaint made no reference to the Discount and Pricing Information forms because, at the time, Thomas erroneously believed the VA was obligated to receive SMS's best price on all capital medical equipment. In 2006, Thomas amended his complaint to remove the state law claims he had asserted. In 2008, the government formally declined to intervene and the District Court ordered the case unsealed. Thomas then amended the complaint a second time before eventually serving it in January 2009. The case was thereafter transferred to the United States District Court for the Eastern District of Pennsylvania.

amend his complaint, which he had already amended twice before. The District Court denied the motion to amend and granted in part the motion to dismiss. The Court left intact Thomas's claims regarding the three contracts described above.

Thomas chose not to take any discovery of the VA or Inspector General or to pursue any third-party evidence or expert testimony regarding relevant practices of the VA or Inspector General. *Siemens AG*, 991 F. Supp. 2d at 575, 595. Thomas also declined to depose the SMS employees who had negotiated and signed the contracts at issue. At the close of expert and fact discovery, SMS moved for summary judgment. The government then submitted a statement of interest, in which it said that it had the complete contractually required information to make a price reasonableness determination and to negotiate a fair and reasonable price for the ultrasound and CT/MRI contracts. (App. at 391-92.) The government included a sworn declaration from Maureen Regan, Counselor to the Inspector General for the VA, in which she affirmed that the VA understood that both companies offered commercial customers discounts greater than those offered to the VA. (App. at 397-98.)

While dispositive motions were pending, Thomas again moved to amend his complaint – his fourth such motion. He sought to add claims related to contracts involved in earlier claims that the District Court had already dismissed from the case. He also sought to assert a new theory of liability as to the three contracts at issue. (App. at 765-80.)

6

The District Court granted summary judgment in favor of SMS on all of Thomas's claims and denied Thomas's motion to amend his complaint. Thomas now appeals only those two orders.

## II.     Discussion[7]

Thomas argues that the District Court erred in concluding that he failed to produce evidence sufficient for a jury to find that SMS and Acuson fraudulently induced the VA to enter into the contracts at issue. He also argues that the District Court abused its discretion in refusing to grant his fourth motion to amend his complaint. Neither position is persuasive.

### A.     *Summary Judgment on Fraudulent Inducement Claims*

The False Claims Act makes it unlawful for any person to "knowingly present[], or cause[] to be presented, ... a false or fraudulent claim for payment or approval" to the government or "knowingly make[], use[], or cause[] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the [g]overnment." 31 U.S.C. § 3729(a)(1)-(2) (1986). The primary purpose of the False Claims Act "is to

---

[7] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the grant of summary judgment de novo, applying the same standard as the district court. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012). "Summary judgment should only be granted if 'there is no genuine dispute as to any material fact.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "In considering the record, we must draw all reasonable inferences in favor of the non-moving party … ." *Id.* We review the denial of a motion to amend a pleading for an abuse of discretion. *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011).

indemnify the government – through its restitutionary penalty provisions – against losses caused by a defendant's fraud." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011) (citations omitted). A private individual, otherwise known as a relator, may bring a civil action in the name of the United States to enforce this provision of the False Claims Act and may share a percentage of any recovery resulting from the suit. 31 U.S.C. § 3730(b) & (d).

Although the focus of the False Claims Act is on false "claims," courts have employed a fraudulent inducement theory to establish liability under the Act for each claim submitted to the government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves. *See generally United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-44 (1943) (superseded by statute) (recognizing fraudulent inducement theory); *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) ("[I]t has long since been settled that a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government... .").

To prevail on a fraudulent inducement claim under the False Claims Act, a plaintiff must show that (1) there was a knowingly false or fraudulent statement; (2) that the statement was material; and (3) that it caused the government to pay out money or to forfeit moneys due (*i.e.*, a "claim"). *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999). Here, the District Court correctly concluded that Thomas could show none of

8

the required elements. It suffices for us to note that Thomas produced no evidence that false statements were knowingly made.

The False Claims Act says statements are made "knowingly" when they are made with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A statement is "false" when it is objectively untrue. *Cf. United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir. 2008) (noting that where relator and defendant simply disagree about how to interpret ambiguous contract language there is no genuine issue as to whether the defendant knowingly presented false claims). The unrebutted evidence in this case demonstrates that the VA forms were ambiguous and that the VA itself accepted different interpretations of how they should be completed, including what kinds of discounts needed to be disclosed. *See supra,* note 3. Acuson disclosed comparable transaction discounts while SMS disclosed comparable contract discounts for the CT/MRI contract and all contract discounts for the nuclear medicine contract. Because Thomas chose not to take any discovery of the government or to depose SMS witnesses, the only evidence in the record establishes that the form was ambiguous, that it was not uncommon for it to be completed incorrectly, that the VA accepted the forms, and that, despite the manner in which the forms were completed, the VA was fully aware before it entered into the contracts at issue that SMS and Acuson offered commercial customers higher discounts than were offered the VA. Based on the record before us, no reasonable juror could conclude that SMS or Acuson made knowingly false statements to the VA.

9

*B.      Thomas's Fourth Motion to Amend the Complaint*

A motion to amend a complaint is committed to the sound discretion of the district court. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001). Among the grounds that could justify a denial of leave to amend are "undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, Thomas's argument that the District Court should have granted his motion to amend the complaint is without merit.

The proposed amendment sought to revive claims relating to other contracts that previously had been dismissed under Rule 9(b). Further, the amendment was predicated on a legal theory – that other SMS and Acuson contracts were "merged" with the contracts at issue – which the District Court had rejected in its ruling on summary judgment. Accordingly, granting leave to amend would have been pointless. In any event, even if the proposed amendment were not both futile and improper, it would still have been highly prejudicial to the Appellees to allow new theories of liability four months after summary judgment motions were filed and well after the close of discovery. Given that the proposed amendment was untimely, futile, and unduly prejudicial, the District Court did not abuse its discretion in refusing to allow it.

## III.   Conclusion

For the forgoing reasons, we will affirm the District Court's grant of summary judgment and its denial of Thomas's fourth motion to amend his complaint.